**Judy AVERETT, individually and on behalf of the heirs of Glen A. Averett, deceased, Plaintiff and Appellant,**

v.

**Timothy L. GRANGE, individually and doing business as Timothy Grange and/or Grange Brothers Trucking, Defendant and Appellee.**

No. 940069.

Supreme Court of Utah.

Dec. 27, 1995.

James R. Black, Salt Lake City, for plaintiff.

Paul M. Belnap, Robert L. Janicki, Salt Lake City, for defendant.

RUSSON, Justice:

Plaintiff Judy Averett appeals from the trial court's entry of summary judgment dismissing her wrongful death action against Timothy L. Grange on the ground that the action was barred by the exclusive remedy provision of the Utah Workers' Compensation Act. We affirm.

## FACTS

This case arose out of a work place accident on July 5, 1988, which resulted in the death of Glen A. Averett. While employed by Geneva Rock Products, Inc. (Geneva Rock), Averett was fatally injured when Grange accidentally backed a ten-wheel dump truck over him at a Geneva Rock job site.

Prior to the accident, Geneva Rock had contracted with Provo City to resurface a certain stretch of road. Because Geneva Rock did not own enough dump trucks to do all the work it had contracted to do, it entered into contracts with other persons and entities which owned trucks. Under these agreements, Geneva Rock agreed to lease both trucks and drivers. Both leased drivers and Geneva Rock's regular drivers were paid by the hour every two weeks; leased drivers were not paid by the job. Once a leased driver was sent to a particular job site, he was under the supervision of the Geneva Rock foreman at that site and the foreman would direct the activities of the leased driver throughout the day.

The contract under which Geneva Rock leased Grange and his truck to work at the project site specifically stated:

The equipment leased hereby shall be used by Lessee [Geneva Rock] as Lessee sees fit and Lessee shall have the sole possession, custody, and control of said equipment at all times in the manner as though it were the absolute owner thereof, and shall have sole exclusive right to supervise and direct the drivers or operators of said equipment....

However, the contract required Grange to provide his own liability and property damage insurance as well as workers' compensation coverage.

In addition to driving his truck, Grange performed other duties at the job site when asked. Also, Grange's truck had a sign attached to its side which read "Geneva Rock" and included Geneva Rock's Public Service Commission (PSC) number. Grange was involved in the same Geneva Rock activity as all of the other truck drivers, both regular and leased, at the time of the accident.

At the time and place of the accident, Averett was serving as foreman of the Provo road resurfacing job site. As foreman for Geneva Rock, Averett was responsible for directing the activities of all regular and leased employees at the site, including Grange. Both the company-owned and the leased Geneva Rock trucks were being used for the same work at the direction of Averett.

Averett also had control of both regular and leased employees as to what, when, how, and where the work was to be done.

On July 5, 1988, while working at the Provo job site, Grange accidentally backed his ten-wheel dump truck over Averett, resulting in Averett's death.

Averett's wife filed a complaint against Grange, Grange's brother Roger, and Mack Truck, Inc., for the wrongful death of Averett.[1] After discovery had been completed, Grange moved for summary judgment on the ground that both he and the decedent were co-employees of Geneva Rock and, thus, he was immune from civil suit under the exclusive remedy provision of section 35–1–60 of the Utah Code. That section provides in pertinent part:

(1) The right to recover compensation pursuant to the provisions of this title for injuries sustained by an employee, whether resulting in death or not, shall be the exclusive remedy against the employer and shall be the exclusive remedy against any officer, agent, or employee of the employer and the liabilities of the employer imposed by this act shall be in place of any and all other civil liability whatsoever, at common law or otherwise, to the employee or to his spouse, widow, children, parents, dependents, next of kin, heirs, personal representatives, guardian, or any other person whomsoever, on account of any accident or injury or death, in any way contracted, sustained, aggravated, or incurred by the employee in the course of or because of or arising out of his employment, and *no action at law may be maintained against an employer or against any officer, agent, or employee of the employer based upon any accident, injury, or death of an employee . . . .*

(Emphasis added.)

The trial court ruled that as a matter of law, Averett and Grange were co-employees of Geneva Rock and that plaintiff's action against Grange was therefore barred by the exclusive remedy provision of section 35–1–60.

Plaintiff appeals, arguing that Grange was an independent contractor who had merely leased a truck and a driver to Averett's employer, Geneva Rock. Thus, she asserts, Grange is specifically included in the group of persons subject to suits arising from work-related actions under section 35–1–62 of the Utah Code. That section provides, in pertinent part, "[T]he injured employee or his heirs or personal representative may also maintain an action for damages against subcontractors, general contractors, independent contractors, property owners or their lessees or assigns, not occupying an employee-employer relationship with the injured or deceased employee at the time of his injury or death." Grange responds that since the two men were working on the same project at the same site under the same supervision and were both subject to the right of control of Geneva Rock, they must be considered co-employees. Therefore, Grange argues, the trial court was correct in granting his motion for summary judgment on the ground that the action was barred by the exclusive remedy provision of section 35–1–60.

## STANDARD OF REVIEW

Summary judgment is proper only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *Higgins v. Salt Lake County,* 855 P.2d 231, 235 (Utah 1993). Because we resolve only legal issues on appeal from a summary judgment, we do not defer to the trial court's conclusions of law but review them for correctness. *Ferree v. State,* 784 P.2d 149, 151 (Utah 1989); *accord Higgins,* 855 P.2d at 235. On appeal, "[w]e determine only whether the trial court erred in applying the governing law and whether the trial court correctly held that there were no disputed issues of material fact." *Ferree,* 784 P.2d at 151 (citing *Bushnell Real Estate, Inc. v. Nielson,* 672 P.2d 746, 749 (Utah 1983); *Bowen v. Riverton City,* 656 P.2d 434, 436 (Utah 1982)).

---

1. Roger Grange and Mack Truck, Inc., were subsequently dismissed by stipulation of the parties.

## ANALYSIS

■ The Workers' Compensation Act defines "independent contractor" for purposes of the act as

> any person engaged in the performance of any work for another who, while so engaged, is independent of the employer in all that pertains to the execution of the work, *is not subject to the rule or control of the employer,* is engaged only in the performance of a definite job or piece of work, and *is subordinate to the employer only in effecting a result in accordance with the employer's design.*

Utah Code Ann. § 35–1–42(2)(b) (emphasis added).

In workers' compensation cases, this court has consistently held that whether an employer-employee relationship exists depends upon the employer's right to control the employee. In *Pinter Construction Co. v. Frisby,* 678 P.2d 305 (Utah 1984), Frisby was a subcontractor of Pinter Construction Company, which was under contract to construct a metal building. This court held that Frisby was an employee of Pinter because Pinter had the right to control Frisby. Therefore, this court held that Frisby, as an employee of Pinter, was entitled to workers' compensation. *Id.* at 308–10. In commenting on section 35–1–42(2), this court stated, "Thus, if an employer hires a contractor, that contractor, his employees, and all subcontractors under him are 'employees' if (1) the employer controls or supervises the contractor's work, and (2) such work is a part or process in the employer's trade or business." *Id.* at 307. The court further held, "It is not the *actual* exercise of control that determines whether an employer-employee relationship exists; it is the right to control that is determinative." *Id.* at 309 (citing *Hinds v. Herm Hughes & Sons, Inc.,* 577 P.2d 561 (Utah 1978); *Bambrough v. Bethers,* 552 P.2d 1286 (Utah 1976); *Smith v. Alfred Brown Co.,* 27 Utah 2d 155, 493 P.2d 994 (1972)).

In addition, in *English v. Kienke,* 848 P.2d 153 (Utah 1993), this court explained the difference between employees and independent contractors for purposes of the Workers' Compensation Act as follows:

> "Speaking in generality: an employee is one who is hired and paid a salary, a wage, or at a fixed rate, to perform the employer's work as directed by the employer and who is subject to a comparatively high degree of control in performing those duties. In contrast, an independent contractor is one who is engaged to do some particular project or piece of work, usually for a set total sum, who may do the job in his [or her] own way, subject to only minimal restriction or controls and is responsible only for its satisfactory completion.
>
> The main facts to be considered as bearing on the relationship here are: (1) whatever covenants or agreements exist concerning the right of direction and control over the employee, whether express or implied; (2) the right to hire and fire; (3) the method of payment, i.e., whether in wages or fees, as compared to payment for a complete job or project; and (4) the furnishing of the equipment."

*Id.* at 157 (quoting *Harry L. Young & Sons v. Ashton,* 538 P.2d 316, 318 (Utah 1975)). Even the case cited by the dissent as being similar to the present case, *Luker Sand & Gravel Co. v. Industrial Commission,* 82 Utah 188, 23 P.2d 225 (1933), clearly and unequivocally states, "When the employer retains supervision and control of the work to be performed, the workmen under him are employees." *Id.* at 195, 23 P.2d at 228. Accordingly, this court held that because the employer did not have the right to control the manner or method in which the driver did his work, the driver was not an employee but an independent contractor.

In the case before us, the following numbered facts are sufficient to conclude that as a matter of law, an employer-employee relationship existed between Grange and Geneva Rock, thereby making Grange and Averett co-employees. (1) The Grange truck lease provided:

> The equipment leased hereby shall be used by Lessee [Geneva Rock] as Lessee sees fit and Lessee shall have the sole possession, custody, and control of said equipment at all times in the manner as though it were the absolute owner thereof, and shall have sole exclusive right to su-

pervise and direct the drivers or operators of said equipment . . . [;]

(2) both Grange and his truck were subject to the direction of Geneva Rock as to what, when, how, and where the work was to be performed; (3) the truck driven by Grange had a sign attached to its side which read "Geneva Rock" and included Geneva Rock's PSC number; (4) Grange also performed other duties at the job site when asked; (5) at the time and place of the accident, both the company-owned and the leased Geneva Rock trucks were being used for the same work at the direction of Geneva Rock foreman Averett; (6) as foreman for Geneva Rock, Averett was responsible for directing the activities of all regular and "leased" employees at the site; (7) leased drivers, like regular Geneva Rock drivers, were paid by the hour every two weeks—leased drivers were not paid by the job; (8) at the time of the accident, Grange was involved in the same Geneva Rock activity as all the other truck drivers. It is clear from these facts that Grange was not an independent contractor but an employee of Geneva Rock and therefore a co-employee of Averett.

■ Moreover, the fact that Grange's contract with Geneva Rock required him to provide his own insurance and workers' compensation coverage does not alter our analysis. In workers' compensation cases, the most important factor in determining whether an employer-employee relationship exists is not what relationship the parties intended to create, but what relationship was *in fact* created. Parties may intend to create an independent contractor relationship, but in doing so they may actually create an employer-employee relationship. Employers cannot escape their responsibility to the public or their employees simply by entering into agreements which identify employees as independent contractors and force them to procure their own insurance and workers' compensation coverage, while insisting on the right to supervise and control when, where, and how they do their work. Otherwise, employers would enter into such agreements with every employee, thereby avoiding legal liability to third parties for employees' actions as well as responsibility under the Workers' Compensation Act.

The dissent, however, deviates from the well-established right-of-control test and argues that professionals such as lawyers, therapists, and accountants would be considered employees of their clients if the inquiry were limited to the right of control. Such argument has no merit. For example, while clients of attorneys have certain rights as to the end product and the time of its accomplishment, which is true in all independent contractor relationships, such clients do not have the right to control when and where the attorney practices law, the manner in which legal work is performed, the type of work the attorney can or cannot do, or the freedom the attorney has to serve other clients. In contrast, where an attorney is actually employed by a private company which retains the right to supervise and direct when and where the attorney will work, the kind of work the attorney will do, and the manner in which such work will be done, an employer-employee relationship has been established.

Furthermore, our decision comports with other well-established principles of workers' compensation law. If Grange had been injured in this accident and had made a claim with Geneva Rock for workers' compensation benefits for such injuries, this court, consistent with prior decisions, clearly would have held that he was an employee and was entitled to such benefits. Accordingly, a claim by a Geneva Rock employee against Grange must be guided by the same principles. As this court has previously stated:

The general rule, which has been approved by this court a number of times is that the act should be liberally construed to effectuate its purpose of providing protection to employees. It would be quite inconsistent with our ideas of even-handed justice to apply a liberal interpretation of the Act in order to assure coverage to employees, but if it appears that there is other coverage, to then reverse the policy and apply a restrictive view to exclude coverage in order to allow an employee to sue an employer. We think the ends of justice will best be served and the beneficial purposes of the Act will be best accomplished for employees and employers alike,

if the statute is applied in an uniform manner, whoever's rights may be at stake. *Smith v. Alfred Brown Co.*, 27 Utah 2d at 158, 493 P.2d at 995 (footnotes omitted).

## CONCLUSION

In the case before us, the facts are relatively simple and involve the relationship between two construction workers involved in the same project. The facts clearly show that Geneva Rock had the right to control where, when, and how Grange did the work. The trial judge was correct in holding that the facts establish an employer-employee relationship between Grange and Geneva Rock as a matter of law. Thus, Grange and Averett were co-employees of Geneva Rock, and workers' compensation was plaintiff's only remedy. Accordingly, we affirm.

ZIMMERMAN, Chief Justice, concurring:

I concur in the opinion of Justice Russon. I write only to note that whatever the merits of the position suggested by Justice Durham as an abstract matter, her proposal represents a fundamental shift in the approach we have taken to the question of who is a co-employee under the workers' compensation statutes. I would leave any such shift to the legislature.

I also note that if we were to adopt the position suggested by Justice Durham, where the legal question of who is a co-employee would be dependent on a fact-intensive balancing determination by a trial court with no single fact being outcome determinative, the result would be to remove virtually all predictability from this area of the law. The effect would be to leave the legal question of who is a co-employee up to each trial judge to decide, subject only to the broadest and most deferential review by the appellate courts. *See State v. Pena,* 869 P.2d 932, 937–38 (Utah 1994). Different judges would be free to reach different conclusions on similar facts, and an appellate court would have no legitimate basis for finding that any of them necessarily erred. *Id.* We should be very hesitant to establish such an unpredictable regime in an area of the law that is so central to the operation of the workers' compensation law and to the structuring of relations between employers and those who perform their work.

HOWE, J., concurs in Chief Justice ZIMMERMAN's concurring opinion.

STEWART, Associate Chief Justice, concurring:

I concur with the majority opinion. I write only to comment upon Justice Durham's dissent. Justice Durham correctly notes that the trend of many jurisdictions is to move away from a strict right-to-control test, either in favor of or in combination with a number of other tests. Those tests purportedly acknowledge a more realistic and comprehensive view of the increasingly complicated nature of employment relationships. In particular, Justice Durham proposes that we adopt a "relative nature of the work" test, which would examine all facets of the employment relationship in determining employment status. She borrows this test from 1B Arthur Larson, *Larson's Workmen's Compensation Law* § 43.52.

While we may well wish to reexamine our general adherence to the right-to-control test at some time in the future, I believe that this case does not afford the appropriate opportunity to do so now. In particular, the application and impact of Justice Durham's proposed test is not adequately defined or assessed in her dissent. Moreover, it is not clear that Larson's commentary accounts for recent trends in on-the-job injury litigation. I address each of these concerns briefly in turn.

Justice Durham focuses on the employment arrangement negotiated between Geneva Rock and Grange. She points to a number of factors—primarily involving Grange's responsibility for maintaining his own equipment and managing his own payroll, insurance, and deductions—which purportedly place Grange in the role of an independent contractor. She then proceeds to outline one of the proposed tests contained in Larson's treatise, the "relative nature of the work" test. Her reliance on this test is, in my view, highly problematic in this particular case. Indeed, application of that test does not seem to produce the result Justice Durham

reaches. Professor Larson indicates that application of the nature-of-the-work test has increasingly led to diminution of the independent contractor status and expansion of employee status. *Larson,* § 43.53 to .54. In other words, according to Larson, application of the nature-of-the-work test is more likely (rather than less likely, as implied by Justice Durham's dissent) to result in a finding of employee status than application of a strict right-to-control test.

Of course, there may be fact patterns more likely to result in a finding of independent contractor status under the nature-of-the-work test than under the right-to-control test and vice versa. The critical point, however, is not so much the labels that are applied to the tests employed for determining the employment status of workers for compensation purposes, but rather the underlying policy rationale that should govern. That rationale must be articulated with some degree of clarity if we are to offer adequate guidance to the bench and bar in applying any new standard.[1] I believe that simply invoking Larson without describing how his test would address the fact pattern at hand does not fulfill that obligation.

This brings me to my second concern with Justice Durham's reliance upon Larson's treatise. Larson presumes that the policy justification underlying workers' compensation is

> that the cost of all industrial accidents should be borne by the customer as a part of the cost of the product. It follows that any worker whose services form a regular and continuing part of the cost of that product, and whose method of operation is not such an independent business that it

forms in itself a separate route through which his own costs of industrial accident can be channelled, is within the presumptive area of intended protection.

*Larson,* § 43.51. On the basis of that policy, Larson outlines a trend toward offering the protection of workers' compensation insurance to an ever-increasing number of workers, many of whom would have been considered independent contractors under the common law master/servant analysis. This focus on the "beneficent" purposes of workers' compensation, however, fails to acknowledge the increasing desire of employers to place themselves under the umbrella of the exclusive remedy provision of workers' compensation and the concomitant desire of many workers to disassociate themselves from the "protection" of workers' compensation remedies in exchange for the potentially more generous offerings of a traditional negligence action. The availability of contingent fee representation renders this latter avenue even more attractive for middle or lower class persons who, prior to the increasing prominence of such arrangements, could not afford legal representation at an hourly rate. Consequently, any reevaluation of the criteria for determining employee status should, as a part of its policy rationale, account for all of the incentives governing employers and workers rather than merely reciting the cost-shifting justification offered by Larson.

DURHAM, Justice, dissenting:

I respectfully dissent. The majority opinion relies exclusively on the traditional right-to-control test. I write separately to voice concerns about the adequacy of this test, applied exclusively, and to suggest an expan-

---

1. In this regard, the examples of potentially defective applications of the right-to-control test offered by the dissent are not, in my view, very helpful. Justice Durham refers to "[lawyers], accountants, therapists, and numerous other professionals" who, she asserts, could be found to be employees of their clients under the right-to-control test, owing to "detailed instructions concerning the manner in which the tasks they have been retained to perform must be accomplished." I do not believe the right-to-control standard transforms the traditional client-professional relationship into an employer-employee relationship. The right-to-control test must preserve the distinction between "supervisory" control (which entails a good deal more than simply directing the performance of a particular task) and mere contractual duty. I think that Justice Durham's opinion underestimates the ability of courts to draw such fundamental distinctions. Nevertheless, to the extent that Justice Durham alerts us to the increasing complexity of modern employment relationships, her point is well taken. There may well be a larger number of indicia which ought to be considered in these cases. Although I believe the right-to-control test often implicitly incorporates some of these indicia, such should not preclude a more careful and explicit elucidation of them by this Court at some time in the future.

sion of the factors to be considered in the analysis of certain employment relationships.

In this case, the record shows that both Grange and Geneva Rock sought to create a working relationship different from employer-employee. In creating the lease which governed the relationship, the parties set out in writing several criteria that distinguished Grange from Geneva Rock employees performing identical jobs. First, Grange had the sole responsibility of maintaining and repairing his own truck. Second, Grange was to pay for his own operating costs, including his own fuel. Third, Grange was required to maintain his own liability insurance policy—he was not covered by Geneva Rock's insurance policies. Fourth, Grange was required to pay for his own workers' compensation insurance—neither party considered Grange a Geneva Rock employee for workers' compensation purposes. Fifth, Grange was required to make his own payroll deductions. Sixth, because Grange had the right to "hire" other drivers to do Geneva Rock's work, the lease clarified that Grange was responsible for making any necessary payroll deductions, carrying workers' compensation insurance, and in other necessary ways, providing for his "employee drivers." Finally, Grange was required to obtain and pay all costs of obtaining any necessary state permits, such as overweight road use permits, and all required licenses for his vehicle. The lease agreement also authorized Grange to employ his truck in business for other companies during the lease term so long as. that use did not interfere with Geneva Rock's use of the vehicle.

These facts demonstrate that in formulating their relationship, the parties contractually sought to maintain the separate identities of Grange Trucking and Geneva Rock. Such a formulation contemplates advantages to and concessions from both parties. By structuring the relationship to maintain the integrity of Grange's independent contractor status, Geneva Rock did not have to pay liability or workers' compensation insurance premiums for Grange; it did not need to service or license the equipment he used; and it was not required to pay a salary to an employee when his services were not needed. Geneva

Rock paid independent contractors only a piecework rate, not a salary. However, in creating this structure, Geneva Rock also had to pay a higher rate for the piecework done by Grange than it paid its own employees for the same work; it lost any potential tax benefits associated with employee salaries; and it was subject to Grange's discretion as to whom he would hire to drive the truck leased to Geneva Rock.

Grange likewise acquired advantages and made concessions under the contractual relationship with Geneva Rock. By structuring his relationship with Geneva Rock as an independent contractor, Grange was paid at a higher rate than the Geneva Rock employees performing identical tasks. He did not have payroll deductions taken out of his paycheck. On the other hand, Grange knew that as an independent contractor he would not be paid on those days that Geneva Rock did not have work for him. He was also ineligible for employee benefits such as insurance or retirement programs.

Freedom of contract generally allows the parties to structure their relationship as they see fit. This structure does not, in and of itself, resolve the question of Grange's status for workers' compensation purposes, however. It is certainly true that a party may be treated as an employee for workers' compensation purposes even though a formal employer-employee relationship is never created. See, e.g., Maryland Casualty Co. v. Industrial Comm'n, 12 Utah 2d 223, 364 P.2d 1020, 1021–22 (1961). In fact, workers may very well be "employees" for some purposes, notwithstanding the parties' contractual agreement that they are not in an employer-employee relationship. See Leach v. Board of Review, 123 Utah 423, 260 P.2d 744, 750 (1953) (for purposes of Employment Security Act, contractual agreement between dealers and installers that installers are contractors is not dispositive). Nonetheless, courts should not disregard evidence of the parties' intentions when such evidence is readily available. It is not the prerogative of the courts to rewrite contracts of parties who have conscientiously attempted to establish a particular legal relationship merely to create easy solutions to legal questions that

arise long after the relationship began. *See John Call Eng'g, Inc. v. Manti City Corp.,* 743 P.2d 1205, 1208 (Utah 1987) (parties should be bound by terms of contracts they voluntarily sign); *Resource Management Co. v. Weston Ranch & Livestock Co.,* 706 P.2d 1028, 1043 (Utah 1985) (duly executed contract should be overturned only by clear and convincing evidence); *see also Maack v. Resource Design & Constr., Inc.,* 875 P.2d 570, 580 (Utah Ct.App.1994) (contract law exists to protect "expectancy interest created through agreement between the parties").

This court has previously addressed the relationship between the structure created by the parties' contract and the appropriate characterization of a party's legal status as employee or independent contractor. In *Luker Sand & Gravel Co. v. Industrial Commission,* 82 Utah 188, 23 P.2d 225 (1933), a case with very similar facts, we held that the owner and operator of a truck hired to haul gravel and rock by Luker was an independent contractor, not an employee, for workers' compensation purposes. Portions of *Luker* focused on elements in the parties' contract that demonstrated the parties' decision to keep their business entities separate, not joined by an employment relationship. Such contractual elements included the truck owner's ability to hire substitute drivers and the gravel company's refusal to offer the driver continuous employment, thereby reserving the right not to pay the driver during down time. Partly on the basis of these considerations, the court concluded that the truck owner was not an "employee" notwithstanding evidence that Luker exercised some control over his work. *Id.* at 195–97, 23 P.2d at 228–29.

Other courts in similar cases have gone beyond analysis based solely upon the right-to-control test. *See, e.g., Reed v. Industrial Comm'n,* 23 Ariz.App. 591, 534 P.2d 1090, 1095 (1975) (holding that truck driver who hauled rocks at direction of defendant was nonetheless an independent contractor, based in part on finding that " 'Reed ... was intended to be by both Reed and Movers, an independent contractor.' " (citation omitted)); *see also* 1B Arthur Larson, *Workmen's Compensation Law* § 43.54 (analyzing modern trend that is going away from strict "right-to-control" test and toward "nature-of-work" test) [hereinafter Larson]; *id.* § 44.22 (cataloging cases wherein court refused to find "employee" status despite showing of right-to-control elements of worker's duties). It seems to me that the question of whether a worker has acquired "employee" status should not be dominated by strict adherence to the right-to-control test to the exclusion of additional important factors. I am persuaded by the trend in many jurisdictions away from the strict right-to-control test. *See id.* § 43.54. Many professionals would be considered the employees of their clients if the inquiry were limited to the control portion of the parties' relationship. For example, a lawyer hired to prepare a will for a client will in some respects be under the "direction" or "control" of the client. The client may specify particular ways she wants asset distribution to take place; she may specify a time frame by which she needs the task completed; she may review the ongoing work and ask for detailed modifications; and she may "fire" the attorney if not satisfied with the work being done. The same could be said for accountants, therapists, and numerous other professionals whose clients require them to follow detailed instructions concerning the manner in which the tasks they have been retained to perform must be accomplished. Nevertheless, these clients cannot in any meaningful sense of the word be said to be the employers of these professionals without further demonstration that the parties have entered into that type of relationship.

It is also useful to note that many of the circumstances supporting the initial adoption of the right-to-control test have changed over the years. During the industrial period of this century, when the right-to-control test gained popularity, an almost universal characteristic of employers was their direct supervision of subordinate employees. Such was, and may in fact still be, the nature of work in a factory or manufacturing setting. However, in today's market, much of the work force has no direct "supervision," as that term was used when the right-to-control test was developed. Consultants, systems analysts, and other modern business func-

tionaries have no counterpart in the industrial arena. Moreover, in the age of computers, modems, and fax machines, a significant amount of work product is generated away from the "direct" control of any supervisor. This does not mean that employees are not under the control of their employers; it simply demonstrates that what was once a reliable indicator of employment status—direct observation and control by a supervisor—is no longer easily demonstrated and is not necessarily the most meaningful indicia of worker status.

I acknowledge that there are numerous approaches used in other jurisdictions to distinguish independent contractors from employees. However, I would apply the more contemporary, expansive approach, using an extended analysis in preference to approaches that adhere to static and narrowly tailored examinations of the parties' working relationship. By examining the totality of circumstances surrounding the parties' relationship, courts can better accommodate the diversity of work relationships that characterizes modern commerce. As noted above, the trend in most jurisdictions is toward the so-called "relative nature of the work" test as the touchstone for making an ultimate distinction between employee and independent contractor. *See* Larson, § 43.54. To illustrate how such an expanded approach might work, I would begin with the elements of the test catalogued by Professor Larson from various jurisdictions already employing it:

> This test, then, which for brevity will be called the "relative nature of the work" test, contains these ingredients: the character of the claimant's work or business— how skilled it is, how much of a separate calling or enterprise it is, to what extent it may be expected to carry its own accident burden and so on—and its relation to the employer's business, that is, how much it is a regular part of the employer's regular work, whether it is continuous or intermittent, and whether the duration is sufficient to amount to the hiring of continuing services as distinguished from contracting for the completion of a particular job.

Larson, § 43.52. This language suggests several independent factors that a court ought to consider. The first of these is the nature of the work being done by the worker. The amount of skill involved in the work, taken alone, would add little relevant information, of course. A surgeon, whose work would always be considered "skilled," might well be an "employee" of a hospital as a sole practitioner/contractor with privileges at numerous hospitals. However, the "skill" prong of the test does take on relevance when it is considered *in relation* to the work done at the facilities of the work provider. Stated differently, if an accounting firm hires a plumber to perform a job at its office, the work provided is skilled in relation to the work generally done by the firm. However, if the firm brings on an additional accountant, the additional work being done is not necessarily skilled or specialized in relation to the work being done by the firm "employees." Still, a specialist accountant may be hired to do a particular project for an accounting firm and, although in the same line of work as the firm employees, would be performing skilled or specialized work in comparison to the other firm accountants.

The second factor Professor Larson catalogues is the independence of the worker from the work provider. Included in this factor are issues regarding how fully the worker holds him- or herself out as an independent business entity. Relevant questions might be whether the worker has independent business licenses or permits; whether the worker is required to carry his or her own liability, workers' compensation, or other insurance policies; and whether the worker or work provider will be expected to remedy any accidents flowing from the work. This factor also entails assessment, directly or indirectly, of how the parties intended the relationship to be structured.

A final element of this expanded test would examine the relative importance of the work being done to the ongoing operations of both the work provider and the worker. In other words, if more than fifty percent of the worker's income routinely comes from one source, that source becomes more likely to be considered "employment" than a specific job. Of course, many independent contractors do routinely perform repetitive services for a

company. For example, a window washer may wash the windows of a particular business on a weekly basis. However, if the window washing is so extensive that it encompasses more than half of the worker's total work time and provides more than half of his or her income, then the business whose windows are being washed begins to take on the appearance of the employer of the window washer. In short, when called upon to distinguish an independent contractor from an employee, I believe that courts should apply the so-called "relative nature of the work" test, as outlined above. This test would provide a more workable and more realistic assessment of the critical issues than earlier tests that focused exclusively on the right to control.

In conclusion, I would hold that the trial court erred when it held as a matter of law that Grange was an employee of Geneva Rock based solely upon the presence of some right by Geneva Rock to control details of Grange's work. I would remand this case back to the trial court for application of the expanded standard I have outlined.