Justice DURHAM,
opinion of the Court:
INTRODUCTION
11 This case concerns the interpretation and application of the term "Employee" in Utah's Governmental Immunity Act (Act). See Utax Cop® §§ 683G-T-101 to -904. Under the Act, plaintiffs who have a claim against a governmental employee for acts committed during the performance of the employee's duties must file a notice of claim within one year after the claim arises, or the claim is barred. Id. §§ 63G-7-401(2), 402. In this case, Randall Roy Mallory was injured in a motorcycle accident while leaving a Brigham Young University (BYU) parking lot. He filed a complaint against BYU and its traffic cadet, Sarah Robinson (together, BYU Defendants),[1] for allegedly causing the injuries he sustained in that accident. In the district court, the BYU Defendants maintained that, at the time of the collision, they were "Employees" of Provo City as defined in the Act. They further argued that because Mr. Mallory failed to file a timely notice of claim with Provo City, his lawsuit was barred. The district court agreed with BYU on both points and consequently dismissed Mr. Mallory's complaint for lack of subject matter jurisdiction. Mr. Mallory timely appealed to the court of appeals, which reversed the district court, holding that dismissal was premature given insufficient evidence that the BYU Defendants were "Employees" under the Act. BYU then filed a petition for writ of certiorari with this court, which we granted.
12 We address two issues. The first is whether the court of appeals erred in its construction of the Act's statutory definition of "Employee," [2] and the second is whether the court of appeals erred in reversing the district court's order of dismissal as premature. We conclude that the court of appeals erred both in interpreting the statutory definition of Employee and in reversing the trial court's dismissal. Accordingly, we reverse and reinstate the district court's order dismissing Mr. Mallory's claims for lack of subject matter jurisdiction.
BACKGROUND
T3 On April 12, 2008, roughly 16,700 people attended BYU's spring football serim-mage at LaVell Edwards Stadium in Provo, Utah. Following the game, Ms. Robinson, a BYU traffic cadet, was directing traffic under the supervision of a BYU peace officer. A Provo City ordinance allows a university's nonpeace officer employees to "direct traffic on public streets while under the supervision of a peace officer employed by the same ... university ... to aid in the orderly movement of traffic related to public gatherings in excess of 5,000 people." Provo, UTtaH, Cope § 9.10.060(2)-(8). At the time of the *925 accident, Ms. Robinson was stationed at the stadium's west exit to facilitate the exodus of motorists onto University Avenue-the public thoroughfare adjacent to the parking lot. During this time, Ms. Robinson was in continuous radio contact with her supervising peace officer. While Ms. Robinson was directing traffic, Mr. Mallory drove his mo-toreyele from the stadium parking lot onto University Avenue and collided with another vehicle. Mr. Mallory suffered serious bodily injury and incurred economic damages as a result of the collision.
T4 In February of the following year, Mr. Mallory filed a complaint alleging that the BYU Defendants, among others, negligently caused Mr. Mallory's collision and were therefore liable for damages. Mr. Mallory later amended his complaint and the BYU Defendants responded with a timely answer. In their answer, the BYU Defendants asserted that Mr. Mailory's claims were barred by the Act because at the time of the accident, Ms. Robinson was an agent (and therefore an Employee) of Provo City and that Mr. Mallory was thus required-but had failed-to file a notice with Provo City within one year of when his claim arose.
15 The BYU Defendants subsequently filed a motion to dismiss, again asserting that Mr. Mallory's claims were barred because he had failed to file a timely notice of claim as required by the Act. The trial court granted the BYU Defendants' motion, holding that because the BYU Defendants were agents of Provo City, they also qualified as its Employees under the Act. As a result, the court ruled that Mr. Mallory's failure to file a timely notice of claim stripped the court of subject matter jurisdiction. The trial court entered a final judgment dismissing all claims against the BYU Defendants, and Mr. Mallory appealed.
16 On review, the Utah Court of Appeals disagreed with the BYU Defendants' assertion that because they were Provo City's agents, they were automatically its Employees. The court of appeals based its conclusion primarily on the fact that the term "agents" is not listed in the Act's definition of Employee. Mallory v. Brigham Young Univ., 2012 UT App 242, ¶ 32, 285 P.3d 1230. The court concluded that "the omission of 'agents' suggest[s] that the Utah Legislature was aware of the imprecision in the use of the term 'agent' and carefully selected language designed to limit immunity to those relationships where the governmental entity exercises control" over the actor sufficient to qualify the actor as the government's servant.[3] Id. T 34 (emphasis added). Additionally, the court of appeals ruled that the district court dismissed the case prematurely because the record provided "no information about the control, if any, exercised by Provo City over the manner in which [the BYU] Defendants performed traffic control activities." Id. 188 (emphasis added). "As a result," the court held, "there is insufficient evidence to establish whether [the BYU] Defendants were acting as Employees of Provo City." Id. In light of that ruling, the court of appeals remanded the case for further proceedings. Id. T 44.
STANDARD OF REVIEW
117 "We review the court of appeals'[ ] interpretation of a statute for correctness and give no deference to its conclusions of law." State v. Ostler, 2001 UT 68, ¶ 5, 31 P.3d 528.
18 With regard to the motion to dismiss, "we review the court of appeals decision for correctness, focusing on whether that court correctly reviewed the [district] court's decision under the appropriate standard of review." Medved v. Glenn, 2005 UT 77, ¶ 8, 125 P.3d 918 (alteration in original) (internal quotation marks omitted). "Juris dictional questions, such as subject matter jurisdiction, are reviewed for correctness." Canfield v. Layton City, 2005 UT 60, ¶ 10, 122 P.3d 622.
ANALYSIS
L THE COURT OF APPEALS ERRED IN ITS CONSTRUCTION OF "EMPLOYEE" UNDER THE ACT
T9 The Act "governs all claims against governmental entities or against their [EJm- *926 ployees or agents arising out of the performance of the [EJmployee's duties, within the seope of employment, or under color of authority." Urax CopEg § 63G-7-101(2)(b).[4] The Act in turn defines "Employee" as a class of persons that "includes ... a governmental entity's officers, employees, servants, trustees, or commissioners" along with nine other specific-but wide-ranging-groups of persons, including tutors, authorized student teachers, members of governing bodies, volunteers, and educational aides. Id. § 68G-T-102(2)(a) (emphasis added). Only one discrete group-independent contractors-is categorically excluded from the statutory definition of Employee. Id. § 63G-T-102(2)(c).
1 10 The BYU Defendants urge us to interpret the Act's definition of Employee to include all authorized agents of a governmental entity except those that are independent contractors. The BYU Defendants acknowledge that the Act does not explicitly include the term "agent" in its statutory definition of Employee, but argue that this omission does not connote the legislature's intent to restrict Employee status to only those enumerated categories. Instead, the BYU Defendants argue that the legislature's decision to define Employee by describing what that term "includes,"-rather than declaring what it "means "-demonstrates the legislature's intent to provide illustrative, but nonexhaustive, examples of Employee status under the Act. Additionally, the BYU Defendants assert that each of the enumerated classes in the statute-including independent contractors-are agents of a governmental entity when performing a governmental function. The BYU Defendants argue, therefore, that the legislature intended Employee to include all agents of a governmental entity except those agents that are independent contractors.
{11 The court of appeals disagreed with the BYU Defendants' interpretation. The court argued that it could not lightly assume that the legislature simply "overlooked 'agents' when listing examples of governmental Employees." Mallory v. Brigham Young Univ., 2012 UT App 242, ¶ 21, 285 P.3d 1230. The court went on to explain that the term agent is "susceptible to both a broad and narrow meaning," the broad meaning characterized by a relationship where the agent has "significant discretion," and the narrow one characterized by a relationship where the "principal maintains strict control." Id. T 24. The court of appeals reasoned that the legislature's omission of the word "agent" acted as a disavowal of the potentially broad meaning of "agent," in light of the legislature's purposeful inclusion of the terms "employee" and "servant"-which connote stricter control-but exclusion of "independent contractor," which connotes less control. In other words, the court of appeals concluded that the structure of the Act's definition of Employee evinced the legislature's intent to "narrow|[ ] the applicability of the [Act's] individual immunity to a subset of the more expansive definition of agent"-specifically to that subset over which the governmental 'entity "can exercise the level of control to create a servant or employee relationship." Id. 127.
¶ 12 We agree with the court of appeals that Employee includes some, but not all, agents as that term is broadly interpreted. That much is clear from the language of the statute expressly excluding those agents that also qualify as independent contractors. See Utax CopE § 68G-T-102(2)(c). But we disagree with the court of appeals' conclusion that a governmental agent who (1) is not an independent contractor, but (2) does not fit neatly into one of the statutorily listed categories of Employees, must "be sufficiently under the control of the governmental entity to qualify as its servant" in order to enjoy Employee status under the Act. Mallory, 2012 UT App 242, ¶ 29, 285 P.3d 1230.
A. The Word "Includes" Is Nonexclusive
$13 "When interpreting statutory language, our primary task is to give effect to the intent of the legislature." Turner v. Staker & Parson Cos., 2012 UT 30, ¶ 12, 284 *927 P.3d 600. "[Wle determine the statute's meaning by first looking to the statute's plain language...." State v. Schofield, 2002 UT 132, ¶ 8, 63 P.3d 667 (internal quotation marks omitted). In doing so, we seek to "render all parts [of the statute] relevant and meaningful," Millett v. Clark Clinic Corp., 609 P.2d 934, 936 (Utah 1980), "avoid[ing] an interpretation which renders portions of, or words in, a statute superfluous or inoperative," Platts v. Parents Helping Parents, 947 P.2d 658, 662 (Utah 1997). Additionally, "[when examining the statutory language we assume the legislature used each term advisedly and in accordance with its ordinary meaning." Provo City v. Ivie, 2008 UT App 287, ¶ 4, 191 P.B8d 841 (internal quotation marks omitted).
114 Utah Code section 68-8-12(1)(f) declares that when any statute uses the word "includes," it "means that the items listed are not an exclusive list, unless the word 'only' or similar language is used to expressly indicate that the list is an exclusive list." See also Boyle v. Christensen, 2011 UT 20, ¶ 27, 251 P.3d 810 ("When 'including' precedes a list, its common usage is to indicate a partial list."). Section 68-8-12(1)(a) further mandates that this rule of construction "shall be observed, unless the construction would be: (i) inconsistent with the manifest intent of the Legislature; or (ii)repugnant to the context of the statute."
1 15 We begin by noting that the Act contains no express language indicating that the list of persons who qualify as Employees under the Act is exclusive. And as discussed below, we find that applying the statutory meaning of "includes" to Utah Code section 63G-7-102(2)(a) yields results neither inconsistent with the intent of the legislature (as derived from its plain language), nor repugnant to its context.
116 We agree with the court of appeals that the legislature "was aware of the imprecision in the use of the term 'agent' and carefully selected language" to clarify, to the extent possible, the intended seope of the definition. Mallory, 2012 UT App 242, ¶ 34, 285 P.3d 1230. But we disagree that the legislature's omission of "agent" in section 63G-7-102(2)(a) necessarily implies that a person or entity that does not fit into one of subsection (2)(a)s enumerated categories "must be sufficiently under the control of the governmental entity to qualify as its servant" in order to be an Employee under the Act. Id. 129 (emphasis added). While the court of appeals' interpretation offers a plausible explanation for the legislature's omission of the word "agent," we ultimately reject it because it nullifies the statutorily mandated meaning of the word "including." Specifically, this interpretation would require persons or entities who do not fit the enumerated categories to shoehorn their relationship with the governmental entity into that of a "servant" (one of the already-listed categories of Employees) in order to establish Employee status. Such a requirement would effectively render section 63G-T-102(2)(a) an exhaustive list rather than a partial one; it would foreclose the possibility-clearly contemplated by the statute's use of the word "includes"-that a governmental entity's agent could be its Employee without fitting neatly into one of the listed categories of subsection (2)(a).
¶ 17 Accordingly, we overrule the court of appeals' finding that "to be individually protected by the [Act], the agent must be sufficiently under the control of the governmental entity to qualify as its servant," if that agent does not fall into one of the other specifically listed categories. Mallory, 2012 UT App 242, ¶ 29, 285 P.3d 1230. In so doing, we hold only that the language of the statute supports the conclusion that Employee status can extend to governmental agents that are neither servants, independent contractors, nor any of the other explicitly listed classes.[5]
*928 II THE BYU DEFENDANTS QUALIFY AS "EMPLOYEES" UNDER THE ACT
€ 18 We now examine whether the court of appeals erred in reversing the trial court's order granting BYU Defendants' motion to dismiss. Because we find that the BYU Defendants were servants, and therefore Employees, of Provo City, we reverse.
{19 As noted above, the district court premised its dismissal upon the determination that the BYU Defendants were servants of Provo City and therefore Employees under the Act. Accordingly, the court held that it lacked subject matter jurisdiction because Mr. Mallory had failed to file a timely notice of claim with Provo City. On review, the Utah Court of Appeals ruled that the trial court's decision was premature, Mallory v. Brigham Young Univ., 2012 UT App 242, ¶ 39, 285 P.3d 1230, because the record was "insufficient to show whether Defendants were acting as servants ... of Provo City, and were therefore Employees covered by the [Act]." Id. 188. The court found the record particularly lacking on the question of how much control Provo City had actually exercised over the BYU Defendants in relation to their governmental function of traffic control. Id. ("[The record does not establish whether Provo City had any role in developing BYU's traffic direction program, provided any oversight of that program, or imposed requirements for the hiring, training, or supervision of cadets.") We disagree with respect to the sufficiency of the record and conclude that based on the evidence presented to the trial court, the BYU Defendants were servants of Provo City and therefore entitled to Employee status under Utah Code section 68G-7-102(2)(a)(i). Accordingly, the trial court properly dismissed Mr. Mallory's claims because he failed to file a timely notice of claim with Provo City. See Utax Cop §§ 63G-7-401(2), -402.
A. Right to Control Is Sufficient to Establish a Master-Servant Relationship
$20 "A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master." Restatement (SEconp) or § 2(2) (1958); see also Buack's Law DictioNARY 1491 (9th ed.2009) (defining "servant" as "a person who, by contract or operation of law, is for a limited period subject to the authority or control of another person in a particular trade, business or occupation" (internal quotation marks omitted)). A master-servant relationship exists "if the [principal] controls, or has the right [to] control, the manner in which the operations are to be carried out." Foster v. Steed, 19 Utah 2d 435, 432 P.2d 60, 62 (1967).
It is important to distinguish between a servant and an agent who is not a servant.... The important distinction is between service in which the actor's physical activities and [his or her] time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results.
Dowsett v. Dowsett, 116 Utah 12, 207 P.2d 809, 811 (1949). Because a master-servant relationship cannot "be defined in general terms with substantial accuracy," courts commonly look to several factors in determining whether such relationship exists. RestatTEMENT (SEcomp) or Acrncy § 220 emt. e (1958). Hallmarks of a master-servant relationship include the "right to discharge" the alleged servant, the "nature of [the] work" performed, and whether the relationship is "for a definite piece of work." Intermountain Speedways, Inc. v. Indus. Comm'n, 101 Utah 573, 126 P.2d 22, 24 (1942). Of paramount importance in this determination, however, is the principal's right to control the "means and method of performance." Id.[6] If the principal has the right to control
*929 the agent's method and manner of performance, that agent is a servant whether or not the right is specifically exercised. But i#f agents rendering service retain the right to control the manner in which it is performed, those agents are not servants. See Dowsett, 207 P.2d at 811 ("'Those rendering service but retaining control over the manner of doing it are not servants." (emphasis omitted)).[7]
B. Provo City Has the Legal Right to Control the BYU Defendants
121 In light of this well established standard for determining the existence of a master-servant relationship, we hold that the BYU Defendants were servants-and therefore Employees-of Provo City because the city retained the right to control the manner in which the BYU Defendants directed traffic. Support for this determination comes from the Provo City Code, which strictly regulates the cireumstances under which the BYU Defendants may perform the city's non-delegable duty of traffic control, and contains several additional controls over the direction of traffic by nonpeace officers, including the city's ability to terminate the BYU Defendants' service at any time.[8]
122 Provo City has adopted an ordinance under which "a person who is employed by a college or university and is not a peace officer may direct traffic on public streets while under the supervision of a peace officer employed by the same college or university." [9] *930 Provo, Cop® § 9.10.060(2).[10] However, the ordinance restricts the engagement of nonpeace officers to the narrow cireumstance of "public emergency or to aid in the orderly movement of traffic related to public gatherings in exeess of 5,000 people." Id. § 9.10.060(8). Moreover, the ordinance grants the Provo chief of police "full power, at any time, to suspend any subordinate officer, or employee, person or agents." Id. § 9.01.050(1).
¶ 23 The relationship between Provo City and the BYU Defendants, acting pursuant to the Provo City ordinance, exhibits the hallmarks of a master-servant relationship. As noted above, the paramount consideration in the master-servant analysis is the "right to control" the manner in which the servant performs its duties Here, the ordinance controls and limits the manner in which BYU may utilize non-peace officers when directing traffic on Provo's public streets.[11] First, the ordinance requires non-officers to be supervised by a state-certified peace officer who can exercise peace officer powers. Provo, Ura Cope § 9.10.060(@); see also UTAK Cope § 53-6-205(1)(b).[12] Provo City's ordinance-mandated supervision requirement means that BYU is not free to direct traffic in any manner that it chooses. For example, BYU may not employ unsupervised traffic cadets, nor may BYU allow traffic cadets to supervise each other.
1 24 Second, the Provo City ordinance controls the cireunmstances under which the BYU Defendants are allowed to direct traffic, narrowing that authority to times of "public emergency" or where necessary "to aid in the orderly movement of traffic related to public gatherings in excess of 5,000 people." Provo, Utan, Cop® § 9.10.060@8). Thus, the BYU Defendants may direct traffic only when these conditions are present, and consequently do not retain wholesale control over when and where they can direct traffic on Provo City's public streets.
*931 125 Third, Provo City ordinance grants the Provo chief of police "full power, at any time, to suspend any subordinate officer, or employee, person or agents, in the Police Department." Id. § 9.01.050(1). Accordingly, Provo City retained the right to discharge the BYU Defendants-as agents of the Police Department-at any time. The dissent argues that the BYU Defendants were not "in the Police Department" and therefore not subject to the Chief's suspension power. However, the language of the ordinance is permissive ("... may direct traffic") when granting authority to non-officers, indicating that the BYU Defendants may conduct traf-fie only at the pleasure and discretion of Provo City. Unlike an independent contractor, the BYU Defendants do not find their authority in contractual terms that grant them independent legal rights under the contract. Instead, they rely only on a permissive grant of authority in a municipal ordinance, an authority which may be granted, modified, or revoked at the will and pleasure of the city, with or without notice, for any or no reason. A conclusion to the contrary-that Provo City did not have the power to fire the BYU Defendants-would be strange indeed, given that Provo City remains invariably responsible for the actions of its agents under the nondelegable duty doctrine. A contrary conclusion would mean that even if Provo City found the BYU Defendants' traffic control practices to be unsafe (but still legal), it could not order them to cease and would have to simply assume all liability for what, in the City's view, was an unsafe practice. This conclusion is untenable-especially in light of the purpose of the Act, which is to protect the public fise. Thus, Provo City surely has authority to protect its financial resources by removing the BYU Defendants if the city determines they are controlling traffic in manner the city deems inappropriate.
126 Finally, and most importantly, we note that because the BYU Defendants derive their authority to direct traffic exelusively from the Provo City ordinance, Provo's city council could, at any time, rescind the ordinance or amend it to provide for additional control and direction over BYU and its agents. For example, Provo City could mandate specific uniforms for nonofficers, require nonofficers to stand in certain places while directing traffic, or direct the use of specific hand gestures. The "fact that [Provo City] failed] to exercise [that right] is of no importance" to the master-servant determination. Christean, 196 P.2d at 507. What matters is the fact that Provo City retains the right to control, by statute, every aspect of traffic regulation on its public streets. In sum, because Provo City has the statutory right to control and discharge the BYU Defendants with respect to the manner, time, place, and cireumstances under which BYU Defendants direct traffic on Provo City streets, the BYU Defendants are servants of Provo City when doing so. And as servants of Provo City, the BYU Defendants also qualify as Employees of Provo City under the Act.
{27 The dissent wonders whether today's holding would potentially extend immunity from civil suit to "private security guards" and "private highway contractors' flagper-sons" by virtue of the statutory restrictions placed upon them. Infra T 44 n. 2. It would not. At most, our decision simply recognizes the possibility that statutorily regulated individuals, if performing a governmental function, may be "Employees" as defined in the Governmental Immunity Act, if they act pursuant to a statute or ordinance that asserts control over the manner in which they perform that governmental function. The group of individuals and entities potentially subject to such classification is small. And even if they qualify as Employees under the Act, the ultimate question of immunity would remain unresolved pending further analysis under the Act's specific requirements, including the myriad waivers of immunity and exceptions to those waivers. See Utax § 683G-7-301. Thus, the dissent's implication that our holding will automatically extend governmental immunity to a extensive array of private actors is misplaced.
C. Smith v. Four Corners Does not Preclude Today's Holding
1128 Mr. Mallory argues that this court's ruling in Smith v. Four Corners Mental Health Center, Inc., 2003 UT 23, 70 P.3d 904, precludes a finding that Ms. Robinson was an *932 Employee under the Act due to lack of sufficient evidence in the record. We disagree.
129 In Four Corners a foster child brought an action against foster parents for an alleged sexual assault perpetrated by another foster child in the home. The foster parents argued that "their status as employees of [the Department of Human Services (DHS)] establishe[d] an agency relationship entitling them to immunity under the umbrella of DHS." Id. 122. The only evidence regarding the relationship between DHS and the foster parents, however, was the foster parents' bare allegations that they were "licensed, approved, and controlled by DHS as foster parents," and that "DHS placed [the foster child] in their home." Id. 127. Importantly, the foster parents did not allege the manner in which DHS controlled, or had the right to control, their service as foster parents,. Without this crucial information, we ruled that "it is not possible to distinguish as a matter of law whether the [foster parents] are [EJmployees, who are entitled to immunity." Id.
130 The facts of this case are readily distinguishable. In Four Corners, the extent to which DHS actually controlled or had the right to control the foster parents was impossible to discern because there was no evidence in this regard beyond the foster parents' mere allegation of general control. In this case, however, the evidence supporting Provo City's right to control is established by more than bare assertions made by the BYU Defendants. The Provo City Code controls whom BYU may employ to direct traffic, when BYU may direct traffic, and mandates that BYU traffic cadets be supervised by a peace officer who is also an employee of BYU. PROVO, Urax, Cope § 9.10.060@). Additionally, other ordinances support the right of Provo City to remove or control any nonofficer who is directing traffic within the Provo City limits See id. § 9.01.050(1). From this evidence, as detailed above, we are able to conclude that Provo City not only had the right to control, but also exercised some degree of actual control over the manner, place, and time in which BYU Defendants directed traffic. Therefore, the BYU Defendants qualify as servants of Provo City and thus as Employees under the Act.
CONCLUSION
{31 We hold that the court of appeals' construction of the Act's statutory definition of Employee was in error. Additionally, we hold that the BYU Defendants were servants of Provo City and therefore statutory Employees under the Act. Consequently, Mr. Mallory's failure to file a timely notice of claim divested the district court of subject matter jurisdiction over his lawsuit, We therefore reverse the court of appeals' decision vacating the trial court's order of dismissal.
Justice DURHAM authored the opinion of the Court, in which Chief Justice DURRANT, and Associate Chief Justice NEHRING, joined.
Judge STONE filed a dissenting opinion, in which Justice PARRISH joined.
Having recused himself, Justice LEE does not participate herein, District Judge ANDREW H. STONE sat.

. Like the court of appeals, we treat these two defendants as one for purposes of our analysis on appeal. We do so because BYU is a corporation and can thus "only act through [its] agents, be they officers or employees." Orlob v. Wasatch Mgmt., 2001 UT App 287, ¶ 18, 33 P.3d 1078 (internal quotation marks omitted). Because Ms. Robinson's actions as a traffic cadet were within the scope of her employment by BYU, her actions and the actions of BYU are one and the same. Therefore, the following analysis is equally applicable to both.

. When referencing the statutory definition of Employee in the Act, we use "Employee." When referencing other meanings of the term, we use "employee."

. The term "servants" is one of the expressly included classes in the Act's definition of "Employee." Urax Cope § 63G-7-102(2)(a)®).

. The Act defines a "claim" as "any asserted demand ... or cause of action ... whether arising ... against a governmental entity or against an [EJmployee in the [Elmployee's personal capacity." Id. § 63G-7-102(1).

. We decline, however, to specifically identify which agents may fall into this category because, as described below, this determination is unnecessary to the outcome of this case. See Goebel v. Salt Lake City S. R.R., 2004 UT 80, ¶ 33, 104 P.3d 1185 ("We generally do not decide issues unnecessary to the outcome of the case. ..."). We do, however, acknowledge not only the complex interplay between the common law statuses of agent, servant, employee, and independent contractor, but also the rather confusing statutory structure of Utah Code section 63G-7-102(2). It would be helpful for the legislature to address the issue of which governmental agents, if any, *928 are covered by the Act's definition of Employee when such agents do not fit within one of the Act's listed categories.

. Utah courts have long held, in a variety of contexts, that the "right to control," is the essential hallmark of a master-servant relationship. E.g., Averett v. Grange, 909 P.2d 246, 249 (Utah 1995); Foster, 432 P.2d at 62 (tort case holding that "if the defendant controls, or has the right [to] control, the manner in which the operations *929 are to be carried out, the defendant is liable as a master") (emphasis added); Christean v. Indus. Comm'n, 113 Utah 451, 196 P.2d 502, 507 (1948) {worker's compensation case holding that the right to control is determinative and "the fact that [the master] fails to exercise [that right] is of no importance"); Utah Fire Clay Co. v. Indus. Comm'n, 86 Utah 1, 40 P.2d 183, 187 (1935) (worker's compensation case holding that "[the distinguishing criterion is the right to control"); Tasters Ltd. v. Dep't of Emp't Sec., 819 P.2d 361, 366 (Utah Ct.App.1991) (employment benefits case emphasizing that the " 'right to control' has historically been an integral element" of the master-servant relationship under the Utah Employment Security Act); Brack's Law Dictionary 1402 (9th ed.2009) (stating that "[alt common law, the [employee-employer] relationship was termed 'master-servant,'" and defining the master-servant relationship as "[the association between one in authority and a subordinate, especially] between an employer and an employee"). We note that in most of these cases the court was examining the distinction between an employee and an independent contractor. While this question is slightly different from the one we address today, we nevertheless find these cases persuasive in light of the historical understanding that the employer-employee relationship is the quintessential example of a master-servant relationship. Thus, while these factors may inform our analysis of the employee versus independent contractor distinction in the Governmental Immunity Act context, we certainly are not bound by them, and the absence of any one of the factors is not fatal to our ultimate conclusion.

. We disagree with the dissent's assertion that the factors enunciated in Averett v. Grange, 909 P.2d 246, 249 (Utah 1995)-including, importantly, the consideration of any covenants or agreements that exist concerning the right to control-are generally applicable outside the workers' compensation context. We read Avereit to explicitly limit mandatory consideration of these factors to the context of workers' compensation. Id. (explaining that the Averett factors, which inform the distinction between employees and independent contractors, were created "for purposes of the Workers' Compensation Act").

. The dissent suggests that the sine qua non of an employer-employee relationship is a contractual agreement, either oral or written, that sets forth the terms of the relationship and the employer's right to control the employee. Infra 1141-42 {concluding that the absence of an "oral or written" agreement creates a "gap in the evidence regarding the pivotal issues of the creation and existence of BYU's relationship with Provo City vis-a-vis the provision of traffic control" and arguing that the majority relies on the "flawed premise[] that the ordinance, rather than an actual agreement" is the source of Provo's authority to control the manner of traffic control). But the dissent does not explain why the key distinction between a servant and an independent contractor-iLe., the right to control the physical manner in which the work is performed-cannot just as easily be established by the text of a city ordinance as it can by the language of a contract. See infra 137. An ordinance can establish this right to control, and, as described below, the Provo City ordinance does grant the city the right to control the physical manner in which traffic control is performed.

. "Peace officers" include "law enforcement officers" under Utah Code section 53-13-102, and " [Jaw enforcement officer' specifically includes ... members of a law enforcement agency established by a private college or university provided that the college or university has been certified by the commissioner of public safety according to the rules of the Department of Public Safety." Urtax Cope § 53-13-103(b)(xi). BYU's University Police is a law enforcement agency certified by *930 the commissioner of public safety as required by this statute.

. This ordinance was enacted pursuant to Utah's Traffic Code, which allows municipalities to adopt "additional traffic ordinances not in conflict with" state law. Uran Cons § 41-6a-207(3).

. The dissent emphasizes the fact that the ordinance is nonbinding to support its conclusion that no contract existed between Provo and the BYU Defendants with respect to traffic control duties. Infra 141 (noting that the "Provo City ordinance is permissive and does not bind anyone to act; it has no effect unless BYU agrees to provide traffic control"). As stated in footnote 8 above, a binding written or oral contract is not necessary to establish a master's right to control; an ordinance can accomplish the same result. But even if it were necessary to establish the existence a contract, this court has held that the existence of a contract modifying employment relationships can be established (or implied in fact) by the conduct of the parties, if such conduct "meet[s] the standards of a unilateral offer and acceptance." Hodgson v. Bunzl Utah, Inc., 844 P.2d 331, 334 (Utah 1992). Unilateral offers are by definition nonbinding in that the offeree is not bound to perform if he or she chooses not to. But a unilateral offer's nonbinding nature has no bearing on whether a contract exists postaccep-tance. A unilateral contract is established if and when the offeree begins substantial performance. The ordinance in this case is like a unilateral offer, which the BYU Defendants accepted by performing traffic control pursuant to the terms of the ordinance. Thus, that the ordinance is nonbinding is irrelevant to the determination of whether a "meeting of the minds" existed between the parties with respect to traffic control on the date in question, after the BYU Defendants had undertaken to perform traffic control. See infra 139 (stating that "a meeting of the minds must exist between the parties" for an agency relationship to exist (internal quotation marks omitted)). In this case, a "meeting of the minds" was indeed established when the BYU Defendants undertook traffic control duties pursuant to the ordinance.

. Contrary to the dissent's assertion, it is not determinative to the question of the BYU Defendants' relationship whether Robinson was supervised by a BYU police officer instead of a Provo City officer. To exercise control over the BYU Defendants, Provo City need not physically participate in the actual direction or training of cadets; rather, Provo City can and does exercise control by requiring that certain individuals with specific training perform the supervision. For example, a business owner may exercise control over an employee cashier by requiring the cashier to be supervised by a manager who in turn has been properly trained-in house or otherwise-to the owner's satisfaction. That is the case here. Provo City required cadets to be supervised by BYU peace officers who are in turn required by state law to undergo training that satisfies Provo City's needs. This requirement is still an exercise of control, even if supervision and training is performed by an entity other than Provo City.