*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2014 UT 27**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

RANDALL ROY MALLORY,
*Plaintiff and Appellee,*

*v.*

BRIGHAM YOUNG UNIVERSITY, a Utah nonprofit corp.,
SARAH ROBINSON, and Does I-X,
*Defendants and Appellants.*

No. 20120799
Filed July 8, 2014

On Certiorari to the Utah Court of Appeals

Fourth District, Provo Dep't
The Honorable Claudia Laycock
No. 090403834

Attorneys:

Curtis L. Wenger, Salt Lake City, for plaintiff

Steven M. Sandberg, Provo, for defendants

JUSTICE DURHAM authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, and ASSOCIATE CHIEF JUSTICE NEHRING,
joined.

JUDGE STONE filed a dissenting opinion, in which JUSTICE PARRISH
joined.

Having recused himself, Justice Lee does not participate herein,
District Judge Andrew H. Stone sat.

JUSTICE DURHAM, opinion of the Court:

## INTRODUCTION

¶1  This case concerns the interpretation and application of the
term "Employee" in Utah's Governmental Immunity Act (Act).
*See* UTAH CODE §§ 63G-7-101 to -904. Under the Act, plaintiffs who
have a claim against a governmental employee for acts committed
during the performance of the employee's duties must file a notice
of claim within one year after the claim arises, or the claim is barred.
*Id.* §§ 63G-7-401(2), -402. In this case, Randall Roy Mallory was
injured in a motorcycle accident while leaving a Brigham Young
University (BYU) parking lot. He filed a complaint against BYU and

its traffic cadet, Sarah Robinson (together, BYU Defendants),[1] for allegedly causing the injuries he sustained in that accident. In the district court, the BYU Defendants maintained that, at the time of the collision, they were "Employees" of Provo City as defined in the Act. They further argued that because Mr. Mallory failed to file a timely notice of claim with Provo City, his lawsuit was barred. The district court agreed with BYU on both points and consequently dismissed Mr. Mallory's complaint for lack of subject matter jurisdiction. Mr. Mallory timely appealed to the court of appeals, which reversed the district court, holding that dismissal was premature given insufficient evidence that the BYU Defendants were "Employees" under the Act. BYU then filed a petition for writ of certiorari with this court, which we granted.

¶2   We address two issues. The first is whether the court of appeals erred in its construction of the Act's statutory definition of "Employee,"[2] and the second is whether the court of appeals erred in reversing the district court's order of dismissal as premature. We conclude that the court of appeals erred both in interpreting the statutory definition of Employee and in reversing the trial court's dismissal. Accordingly, we reverse and reinstate the district court's order dismissing Mr. Mallory's claims for lack of subject matter jurisdiction.

## BACKGROUND

¶3   On April 12, 2008, roughly 16,700 people attended BYU's spring football scrimmage at LaVell Edwards Stadium in Provo, Utah. Following the game, Ms. Robinson, a BYU traffic cadet, was directing traffic under the supervision of a BYU peace officer. A Provo City ordinance allows a university's nonpeace officer employees to "direct traffic on public streets while under the

---

[1]  Like the court of appeals, we treat these two defendants as one for purposes of our analysis on appeal. We do so because BYU is a corporation and can thus "only act through [its] agents, be they officers or employees." *Orlob v. Wasatch Mgmt.*, 2001 UT App 287, ¶ 18, 33 P.3d 1078 (internal quotation marks omitted). Because Ms. Robinson's actions as a traffic cadet were within the scope of her employment by BYU, her actions and the actions of BYU are one and the same. Therefore, the following analysis is equally applicable to both.

[2]  When referencing the statutory definition of Employee in the Act, we use "Employee." When referencing other meanings of the term, we use "employee."

supervision of a peace officer employed by the same . . . university . . . to aid in the orderly movement of traffic related to public gatherings in excess of 5,000 people." PROVO, UTAH, CODE § 9.10.060(2)–(3). At the time of the accident, Ms. Robinson was stationed at the stadium's west exit to facilitate the exodus of motorists onto University Avenue—the public thoroughfare adjacent to the parking lot. During this time, Ms. Robinson was in continuous radio contact with her supervising peace officer. While Ms. Robinson was directing traffic, Mr. Mallory drove his motorcycle from the stadium parking lot onto University Avenue and collided with another vehicle. Mr. Mallory suffered serious bodily injury and incurred economic damages as a result of the collision.

¶4    In February of the following year, Mr. Mallory filed a complaint alleging that the BYU Defendants, among others, negligently caused Mr. Mallory's collision and were therefore liable for damages. Mr. Mallory later amended his complaint and the BYU Defendants responded with a timely answer. In their answer, the BYU Defendants asserted that Mr. Mallory's claims were barred by the Act because at the time of the accident, Ms. Robinson was an agent (and therefore an Employee) of Provo City and that Mr. Mallory was thus required—but had failed—to file a notice with Provo City within one year of when his claim arose.

¶5    The BYU Defendants subsequently filed a motion to dismiss, again asserting that Mr. Mallory's claims were barred because he had failed to file a timely notice of claim as required by the Act. The trial court granted the BYU Defendants' motion, holding that because the BYU Defendants were agents of Provo City, they also qualified as its Employees under the Act. As a result, the court ruled that Mr. Mallory's failure to file a timely notice of claim stripped the court of subject matter jurisdiction. The trial court entered a final judgment dismissing all claims against the BYU Defendants, and Mr. Mallory appealed.

¶6    On review, the Utah Court of Appeals disagreed with the BYU Defendants' assertion that because they were Provo City's agents, they were automatically its Employees. The court of appeals based its conclusion primarily on the fact that the term "agents" is not listed in the Act's definition of Employee. *Mallory v. Brigham Young Univ.*, 2012 UT App 242, ¶ 32, 285 P.3d 1230. The court concluded that "the omission of 'agents' suggest[s] that the Utah Legislature was aware of the imprecision in the use of the term 'agent' and carefully selected language designed to limit immunity

to those relationships where the governmental entity *exercises control*" over the actor sufficient to qualify the actor as the government's servant.[3] *Id.* ¶ 34 (emphasis added). Additionally, the court of appeals ruled that the district court dismissed the case prematurely because the record provided "no information about the control, if any, *exercised* by Provo City over the manner in which [the BYU] Defendants performed traffic control activities." *Id.* ¶ 38 (emphasis added). "As a result," the court held, "there is insufficient evidence to establish whether [the BYU] Defendants were acting as Employees of Provo City." *Id.* In light of that ruling, the court of appeals remanded the case for further proceedings. *Id.* ¶ 44.

## STANDARD OF REVIEW

¶7    "We review the court of appeals'[] interpretation of a statute for correctness and give no deference to its conclusions of law." *State v. Ostler*, 2001 UT 68, ¶ 5, 31 P.3d 528.

¶8    With regard to the motion to dismiss, "we review the court of appeals' decision for correctness, focusing on whether that court correctly reviewed the [district] court's decision under the appropriate standard of review." *Medved v. Glenn*, 2005 UT 77, ¶ 8, 125 P.3d 913 (alteration in original) (internal quotation marks omitted). "Jurisdictional questions, such as subject matter jurisdiction, are reviewed for correctness." *Canfield v. Layton City*, 2005 UT 60, ¶ 10, 122 P.3d 622.

## ANALYSIS

### I. THE COURT OF APPEALS ERRED IN ITS CONSTRUCTION OF "EMPLOYEE" UNDER THE ACT

¶9    The Act "governs all claims against governmental entities or against their [E]mployees or agents arising out of the performance of the [E]mployee's duties, within the scope of employment, or under color of authority." UTAH CODE § 63G-7-101(2)(b).[4] The Act in turn defines "Employee" as a class of persons that "*includes* . . . a governmental entity's officers, employees, servants, trustees, or commissioners" along with nine other specific—but wide-ranging—groups of persons, including tutors, authorized student

---

[3] The term "servants" is one of the expressly included classes in the Act's definition of "Employee." UTAH CODE § 63G-7-102(2)(a)(i).

[4] The Act defines a "claim" as "any asserted demand . . . or cause of action . . . whether arising . . . against a governmental entity or against an [E]mployee in the [E]mployee's personal capacity." *Id.* § 63G-7-102(1).

teachers, members of governing bodies, volunteers, and educational aides. *Id.* § 63G-7-102(2)(a) (emphasis added). Only one discrete group—independent contractors—is categorically excluded from the statutory definition of Employee. *Id.* § 63G-7-102(2)(c).

¶10 The BYU Defendants urge us to interpret the Act's definition of Employee to include *all* authorized agents of a governmental entity except those that are independent contractors. The BYU Defendants acknowledge that the Act does not explicitly include the term "agent" in its statutory definition of Employee, but argue that this omission does not connote the legislature's intent to restrict Employee status to only those enumerated categories. Instead, the BYU Defendants argue that the legislature's decision to define Employee by describing what that term "*includes*,"—rather than declaring what it "*means*"—demonstrates the legislature's intent to provide illustrative, but nonexhaustive, examples of Employee status under the Act. Additionally, the BYU Defendants assert that each of the enumerated classes in the statute—including independent contractors—are agents of a governmental entity when performing a governmental function. The BYU Defendants argue, therefore, that the legislature intended Employee to include all agents of a governmental entity except those agents that are independent contractors.

¶11 The court of appeals disagreed with the BYU Defendants' interpretation. The court argued that it could not lightly assume that the legislature simply "overlooked 'agents' when listing examples of governmental Employees." *Mallory v. Brigham Young Univ.*, 2012 UT App 242, ¶ 21, 285 P.3d 1230. The court went on to explain that the term agent is "susceptible to both a broad and narrow meaning," the broad meaning characterized by a relationship where the agent has "significant discretion," and the narrow one characterized by a relationship where the "principal maintains strict control." *Id.* ¶ 24. The court of appeals reasoned that the legislature's omission of the word "agent" acted as a disavowal of the potentially broad meaning of "agent," in light of the legislature's purposeful inclusion of the terms "employee" and "servant"—which connote stricter control—but exclusion of "independent contractor," which connotes less control. In other words, the court of appeals concluded that the structure of the Act's definition of Employee evinced the legislature's intent to "narrow[] the applicability of the [Act's] individual immunity to a subset of the more expansive definition of agent"— specifically to that subset over which the governmental entity "can exercise the level of control to create a servant or employee relationship." *Id.* ¶ 27.

¶12 We agree with the court of appeals that Employee includes some, but not all, agents as that term is broadly interpreted. That much is clear from the language of the statute expressly excluding those agents that also qualify as independent contractors. *See* UTAH CODE § 63G-7-102(2)(c). But we disagree with the court of appeals' conclusion that a governmental agent who (1) is not an independent contractor, but (2) does not fit neatly into one of the statutorily listed categories of Employees, must "be sufficiently under the control of the governmental entity to qualify as its servant" in order to enjoy Employee status under the Act. *Mallory*, 2012 UT App 242, ¶ 29.

*A. The Word "Includes" Is Nonexclusive*

¶13 "When interpreting statutory language, our primary task is to give effect to the intent of the legislature." *Turner v. Staker & Parson Cos.*, 2012 UT 30, ¶ 12, 284 P.3d 600. "[W]e determine the statute's meaning by first looking to the statute's plain language . . . ." *State v. Schofield*, 2002 UT 132, ¶ 8, 63 P.3d 667 (internal quotation marks omitted). In doing so, we seek to "render all parts [of the statute] relevant and meaningful," *Millett v. Clark Clinic Corp.,* 609 P.2d 934, 936 (Utah 1980), "avoid[ing] an interpretation which renders portions of, or words in, a statute superfluous or inoperative," *Platts v. Parents Helping Parents,* 947 P.2d 658, 662 (Utah 1997). Additionally, "[w]hen examining the statutory language we assume the legislature used each term advisedly and in accordance with its ordinary meaning." *Provo City v. Ivie*, 2008 UT App 287, ¶ 4, 191 P.3d 841 (internal quotation marks omitted).

¶14 Utah Code section 68-3-12(1)(f) declares that when any statute uses the word "includes," it "means that the items listed are not an exclusive list, unless the word 'only' or similar language is used to expressly indicate that the list is an exclusive list." *See also Boyle v. Christensen*, 2011 UT 20, ¶ 27, 251 P.3d 810 ("When 'including' precedes a list, its common usage is to indicate a partial list."). Section 68-3-12(1)(a) further mandates that this rule of construction "shall be observed, unless the construction would be: (i) inconsistent with the manifest intent of the Legislature; or (ii) repugnant to the context of the statute."

¶15 We begin by noting that the Act contains no express language indicating that the list of persons who qualify as Employees under the Act is exclusive. And as discussed below, we find that applying the statutory meaning of "includes" to Utah Code section 63G-7-102(2)(a) yields results neither inconsistent with the

intent of the legislature (as derived from its plain language), nor repugnant to its context.

¶16 We agree with the court of appeals that the legislature "was aware of the imprecision in the use of the term 'agent' and carefully selected language" to clarify, to the extent possible, the intended scope of the definition. *Mallory*, 2012 UT App 242, ¶ 34. But we disagree that the legislature's omission of "agent" in section 63G-7-102(2)(a) necessarily implies that a person or entity that does not fit into one of subsection (2)(a)'s enumerated categories "must be sufficiently under the control of the governmental entity to qualify as its *servant*" in order to be an Employee under the Act. *Id.* ¶ 29 (emphasis added). While the court of appeals' interpretation offers a plausible explanation for the legislature's omission of the word "agent," we ultimately reject it because it nullifies the statutorily mandated meaning of the word "including." Specifically, this interpretation would require persons or entities who do not fit the enumerated categories to shoehorn their relationship with the governmental entity into that of a "servant" (one of the already-listed categories of Employees) in order to establish Employee status. Such a requirement would effectively render section 63G-7-102(2)(a) an exhaustive list rather than a partial one; it would foreclose the possibility—clearly contemplated by the statute's use of the word "includes"— that a governmental entity's agent could be its Employee without fitting neatly into one of the listed categories of subsection (2)(a).

¶17 Accordingly, we overrule the court of appeals' finding that "to be individually protected by the [Act], the agent must be sufficiently under the control of the governmental entity to qualify as its servant," if that agent does not fall into one of the other specifically listed categories. *Mallory*, 2012 UT App 242, ¶ 29. In so doing, we hold only that the language of the statute supports the conclusion that Employee status can extend to governmental agents that are neither servants, independent contractors, nor any of the other explicitly listed classes.[5]

---

[5] We decline, however, to specifically identify which agents may fall into this category because, as described below, this determination is unnecessary to the outcome of this case. *See Goebel v. Salt Lake City S. R.R.*, 2004 UT 80, ¶ 33, 104 P.3d 1185 ("We generally do not decide issues unnecessary to the outcome of the case . . . ."). We do, however, acknowledge not only the complex interplay between the common law statuses of agent, servant,

(continued...)

## II. THE BYU DEFENDANTS QUALIFY AS "EMPLOYEES" UNDER THE ACT

¶19  We now examine whether the court of appeals erred in reversing the trial court's order granting BYU Defendants' motion to dismiss. Because we find that the BYU Defendants were servants, and therefore Employees, of Provo City, we reverse.

¶20  As noted above, the district court premised its dismissal upon the determination that the BYU Defendants were servants of Provo City and therefore Employees under the Act. Accordingly, the court held that it lacked subject matter jurisdiction because Mr. Mallory had failed to file a timely notice of claim with Provo City. On review, the Utah Court of Appeals ruled that the trial court's decision was premature, *Mallory v. Brigham Young Univ.*, 2012 UT App 242, ¶ 39, 285 P.3d 1230,  because the record was "insufficient to show whether Defendants were acting as servants . . . of Provo City, and were therefore Employees covered by the [Act]." *Id.* ¶ 38. The court found the record particularly lacking on the question of how much control Provo City had actually *exercised* over the BYU Defendants in relation to their governmental function of traffic control. *Id.* ("[T]he record does not establish whether Provo City had any role in developing BYU's traffic direction program, provided any oversight of that program, or imposed requirements for the hiring, training, or supervision of cadets.") We disagree with respect to the sufficiency of the record and conclude that based on the evidence presented to the trial court, the BYU Defendants were servants of Provo City and therefore entitled to Employee status under Utah Code section 63G-7-102(2)(a)(i). Accordingly, the trial court properly dismissed Mr. Mallory's claims because he failed to file a timely notice of claim with Provo City. *See* UTAH CODE §§ 63G-7-401(2), -402.

### A. Right to Control Is Sufficient to Establish a Master-Servant Relationship

¶21  "A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance of

---

[5]  (...continued)
employee, and independent contractor, but also the rather confusing statutory structure of Utah Code section 63G-7-102(2). It would be helpful for the legislature to address the issue of which governmental agents, if any, are covered by the Act's definition of Employee when such agents do not fit within one of the Act's listed categories.

the service is controlled or is subject to the right to control by the master." RESTATEMENT (SECOND) OF AGENCY § 2(2) (1958); *see also* BLACK'S LAW DICTIONARY 1491 (9th ed. 2009) (defining "servant" as "a person who, by contract or operation of law, is for a limited period subject to the authority or control of another person in a particular trade, business or occupation" (internal quotation marks omitted)). A master-servant relationship exists "if the [principal] controls, or has the right [to] control, the manner in which the operations are to be carried out." *Foster v. Steed*, 432 P.2d 60, 62 (Utah 1967).

> It is important to distinguish between a servant and an agent who is not a servant . . . . The important distinction is between service in which the actor's physical activities and [his or her] time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results.

*Dowsett v. Dowsett*, 207 P.2d 809, 811 (Utah 1949). Because a master-servant relationship cannot "be defined in general terms with substantial accuracy," courts commonly look to several factors in determining whether such relationship exists. RESTATEMENT (SECOND) OF AGENCY § 220 cmt. c (1958). Hallmarks of a master-servant relationship include the "right to discharge" the alleged servant, the "nature of [the] work" performed, and whether the relationship is "for a definite piece of work." *Intermountain Speedways, Inc. v. Indus. Comm'n*, 126 P.2d 22, 24 (Utah 1942). Of paramount importance in this determination, however, is the principal's right to control the "means and method of performance." *Id.*[6] If the principal has the right to control the agent's method and

---

[6] Utah courts have long held, in a variety of contexts, that the "right to control," is the essential hallmark of a master-servant relationship. *E.g., Averett v. Grange*, 909 P.2d 246, 249 (Utah 1995); *Foster*, 432 P.2d at 62 (tort case holding that "if the defendant controls, or has the *right [to] control*, the manner in which the operations are to be carried out, the defendant is liable as a master") (emphasis added)); *Christean v. Indus. Comm'n*, 196 P.2d 502, 507 (Utah 1948) (worker's compensation case holding that the right to control is determinative and "the fact that [the master] fails to exercise [that right] is of no importance"); *Utah Fire Clay Co. v. Indus. Comm'n*, 40 P.2d 183, 187 (Utah 1935) (worker's compensation case holding that "[t]he distinguishing criterion is the right to control");

(continued...)

manner of performance, that agent is a servant whether or not the right is specifically exercised. But if agents rendering service retain the right to control the manner in which it is performed, those agents are not servants. *See Dowsett*, 207 P.2d at 811 ("Those rendering service but retaining control over the manner of doing it are not servants." (emphasis omitted)).[7]

*B. Provo City Has the Legal Right to Control the BYU Defendants*

¶22   In light of this well established standard for determining the existence of a master-servant relationship, we hold that the BYU Defendants were servants—and therefore Employees—of Provo City because the city retained the right to control the manner in which the BYU Defendants directed traffic. Support for this determination

---

[6]   (...continued)
*Tasters Ltd. v. Dep't of Emp't Sec.*, 819 P.2d 361, 366 (Utah Ct. App. 1991) (employment benefits case emphasizing that the "'right to control' has historically been an integral element" of the master–servant relationship under the Utah Employment Security Act); BLACK'S LAW DICTIONARY 1402 (9th ed. 2009) (stating that "[a]t common law, the [employee-employer] relationship was termed 'master-servant,'" and defining the master-servant relationship as "[t]he association between one in authority and a subordinate, esp[ecially] between an employer and an employee"). We note that in most of these cases the court was examining the distinction between an employee and an independent contractor. While this question is slightly different from the one we address today, we nevertheless find these cases persuasive in light of the historical understanding that the employer-employee relationship is the quintessential example of a master-servant relationship.

[7]   We disagree with the dissent's assertion that the factors enunciated in *Averett v. Grange*, 909 P.2d 246, 249 (Utah 1995)—including, importantly, the consideration of any covenants or agreements that exist concerning the right to control—are generally applicable outside the workers' compensation context. We read *Averett* to explicitly limit mandatory consideration of these factors to the context of workers' compensation. *Id.* (explaining that the *Averett* factors, which inform the distinction between employees and independent contractors, were created "for purposes of the Workers' Compensation Act"). Thus, while these factors may inform our analysis of the employee versus independent contractor distinction in the Governmental Immunity Act context, we certainly are not bound by them, and the absence of any one of the factors is not fatal to our ultimate conclusion.

comes from the Provo City Code, which strictly regulates the circumstances under which the BYU Defendants may perform the city's nondelegable duty of traffic control, and contains several additional controls over the direction of traffic by nonpeace officers, including the city's ability to terminate the BYU Defendants' service at any time.[8]

¶23 Provo City has adopted an ordinance under which "a person who is employed by a college or university and is not a peace officer may direct traffic on public streets while under the supervision of a peace officer employed by the same college or university."[9] PROVO, UTAH, CODE § 9.10.060(2).[10] However, the ordinance restricts the engagement of nonpeace officers to the

---

[8] The dissent suggests that the *sine qua non* of an employer-employee relationship is a contractual agreement, either oral or written, that sets forth the terms of the relationship and the employer's right to control the employee. *Infra* ¶¶ 41–42 (concluding that the absence of an "oral or written" agreement creates a "gap in the evidence regarding the pivotal issues of the creation and existence of BYU's relationship with Provo City vis-à-vis the provision of traffic control" and arguing that the majority relies on the "flawed premise[] that the ordinance, rather than an actual agreement" is the source of Provo's authority to control the manner of traffic control). But the dissent does not explain why the key distinction between a servant and an independent contractor—i.e., the right to control the physical manner in which the work is performed—cannot just as easily be established by the text of a city ordinance as it can by the language of a contract. *See infra* ¶ 37. An ordinance can establish this right to control, and, as described below, the Provo City ordinance does grant the city the right to control the physical manner in which traffic control is performed.

[9] "Peace officers" include "law enforcement officers" under Utah Code section 53-13-102, and "'[l]aw enforcement officer' specifically includes . . . members of a law enforcement agency established by a private college or university provided that the college or university has been certified by the commissioner of public safety according to the rules of the Department of Public Safety." UTAH CODE § 53-13-103(b)(xi). BYU's University Police is a law enforcement agency certified by the commissioner of public safety as required by this statute.

[10] This ordinance was enacted pursuant to Utah's Traffic Code, which allows municipalities to adopt "additional traffic ordinances not in conflict with" state law. UTAH CODE § 41-6a-207(3).

narrow circumstance of "public emergency or to aid in the orderly movement of traffic related to public gatherings in excess of 5,000 people." *Id.* § 9.10.060(3). Moreover, the ordinance grants the Provo chief of police "full power, at any time, to suspend any subordinate officer, or employee, person or agents." *Id.* § 9.01.050(1).

¶24 The relationship between Provo City and the BYU Defendants, acting pursuant to the Provo City ordinance, exhibits the hallmarks of a master-servant relationship. As noted above, the paramount consideration in the master-servant analysis is the "right to control" the manner in which the servant performs its duties. Here, the ordinance controls and limits the manner in which BYU may utilize non-peace officers when directing traffic on Provo's public streets.[11] First, the ordinance requires non-officers to be

---

[11] The dissent emphasizes the fact that the ordinance is nonbinding to support its conclusion that no contract existed between Provo and the BYU Defendants with respect to traffic control duties. *Infra* ¶ 41 (noting that the "Provo City ordinance is permissive and does not bind anyone to act; it has no effect unless BYU agrees to provide traffic control"). As stated in footnote 8 above, a binding written or oral contract is not necessary to establish a master's right to control; an ordinance can accomplish the same result. But even if it were necessary to establish the existence a contract, this court has held that the existence of a contract modifying employment relationships can be established (or implied in fact) by the conduct of the parties, if such conduct "meet[s] the standards of a unilateral offer and acceptance." *Hodgson v. Bunzl Utah, Inc.*, 844 P.2d 331, 334 (Utah 1992). Unilateral offers are by definition nonbinding in that the offeree is not bound to perform if he or she chooses not to. But a unilateral offer's nonbinding nature has no bearing on whether a contract exists postacceptance. A unilateral contract *is* established if and when the offeree begins substantial performance. The ordinance in this case is like a unilateral offer, which the BYU Defendants accepted by performing traffic control pursuant to the terms of the ordinance. Thus, that the ordinance is nonbinding is irrelevant to the determination of whether a "meeting of the minds" existed between the parties with respect to traffic control on the date in question, after the BYU Defendants had undertaken to perform traffic control. *See infra* ¶ 39 (stating that "a meeting of the minds must exist between the parties" for an agency relationship to exist (internal quotation marks omitted)). In this case, a "meeting of the minds" was indeed

(continued...)

supervised by a state-certified peace officer who can exercise peace officer powers. PROVO, UTAH CODE § 9.10.060(2); *see also* UTAH CODE § 53-6-205(1)(b).[12] Provo City's ordinance-mandated supervision requirement means that BYU is not free to direct traffic in any manner that it chooses. For example, BYU may not employ unsupervised traffic cadets, nor may BYU allow traffic cadets to supervise each other.

¶25 Second, the Provo City ordinance controls the circumstances under which the BYU Defendants are allowed to direct traffic, narrowing that authority to times of "public emergency" or where necessary "to aid in the orderly movement of traffic related to public gatherings in excess of 5,000 people." PROVO, UTAH, CODE § 9.10.060(3). Thus, the BYU Defendants may direct traffic only when these conditions are present, and consequently do not retain wholesale control over when and where they can direct traffic on Provo City's public streets.

¶26 Third, Provo City ordinance grants the Provo chief of police "full power, at any time, to suspend any subordinate officer, or employee, person or agents, in the Police Department." *Id.* § 9.01.050(1). Accordingly, Provo City retained the right to discharge the BYU Defendants—as agents of the Police Department— at any time. The dissent argues that the BYU Defendants were not "*in* the Police Department" and therefore not subject to the Chief's

---

[11] (...continued) established when the BYU Defendants undertook traffic control duties pursuant to the ordinance.

[12] Contrary to the dissent's assertion, it is not determinative to the question of the BYU Defendants' relationship whether Robinson was supervised by a BYU police officer instead of a Provo City officer. To exercise control over the BYU Defendants, Provo City need not physically participate in the actual direction or training of cadets; rather, Provo City can and does exercise control by requiring that certain individuals with specific training perform the supervision. For example, a business owner may exercise control over an employee cashier by requiring the cashier to be supervised by a manager who in turn has been properly trained—in house or otherwise—to the owner's satisfaction. That is the case here. Provo City required cadets to be supervised by BYU peace officers who are in turn required by state law to undergo training that satisfies Provo City's needs. This requirement is still an exercise of control, even if supervision and training is performed by an entity other than Provo City.

suspension power. However, the language of the ordinance is permissive ("…*may* direct traffic") when granting authority to non-officers, indicating that the BYU Defendants may conduct traffic only at the pleasure and discretion of Provo City. Unlike an independent contractor, the BYU Defendants do not find their authority in contractual terms that grant them independent legal rights under the contract. Instead, they rely only on a permissive grant of authority in a municipal ordinance, an authority which may be granted, modified, or revoked at the will and pleasure of the city, with or without notice, for any or no reason. A conclusion to the contrary—that Provo City did not have the power to fire the BYU Defendants—would be strange indeed, given that Provo City remains invariably responsible for the actions of its agents under the nondelegable duty doctrine. A contrary conclusion would mean that even if Provo City found the BYU Defendants' traffic control practices to be unsafe (but still legal), it could not order them to cease and would have to simply assume all liability for what, in the City's view, was an unsafe practice. This conclusion is untenable—especially in light of the purpose of the Act, which is to protect the public fisc. Thus, Provo City surely has authority to protect its financial resources by removing the BYU Defendants if the city determines they are controlling traffic in manner the city deems inappropriate.

¶27 Finally, and most importantly, we note that because the BYU Defendants derive their authority to direct traffic exclusively from the Provo City ordinance, Provo's city council could, at any time, rescind the ordinance or amend it to provide for additional control and direction over BYU and its agents. For example, Provo City could mandate specific uniforms for nonofficers, require nonofficers to stand in certain places while directing traffic, or direct the use of specific hand gestures. The "fact that [Provo City] fail[ed] to exercise [that right] is of no importance" to the master-servant determination. *Christean*, 196 P.2d at 507. What matters is the fact that Provo City retains the right to control, by statute, every aspect of traffic regulation on its public streets. In sum, because Provo City has the statutory right to control and discharge the BYU Defendants with respect to the manner, time, place, and circumstances under which BYU Defendants direct traffic on Provo City streets, the BYU Defendants are servants of Provo City when doing so. And as servants of Provo City, the BYU Defendants also qualify as Employees of Provo City under the Act.

¶28 The dissent wonders whether today's holding would potentially extend immunity from civil suit to "private security

guards" and "private highway contractors' flagpersons" by virtue of the statutory restrictions placed upon them. *Infra* ¶ 44 n.2. It would not. At most, our decision simply recognizes the possibility that statutorily regulated individuals, *if* performing a governmental function, *may* be "Employees" as defined in the Governmental Immunity Act, *if* they act pursuant to a statute or ordinance that asserts control over the manner in which they perform that governmental function. The group of individuals and entities potentially subject to such classification is small. And even if they qualify as Employees under the Act, the ultimate question of *immunity* would remain unresolved pending further analysis under the Act's specific requirements, including the myriad waivers of immunity and exceptions to those waivers. *See* UTAH CODE § 63G-7-301. Thus, the dissent's implication that our holding will automatically extend governmental *immunity* to a extensive array of private actors is misplaced.

### C. Smith v. Four Corners *Does not Preclude Today's Holding*

¶29 Mr. Mallory argues that this court's ruling in *Smith v. Four Corners Mental Health Center, Inc.*, 2003 UT 23, 70 P.3d 904, precludes a finding that Ms. Robinson was an Employee under the Act due to lack of sufficient evidence in the record. We disagree.

¶30 In *Four Corners*, a foster child brought an action against foster parents for an alleged sexual assault perpetrated by another foster child in the home. The foster parents argued that "their status as employees of [the Department of Human Services (DHS)] establishe[d] an agency relationship entitling them to immunity under the umbrella of DHS." *Id.* ¶ 22. The only evidence regarding the relationship between DHS and the foster parents, however, was the foster parents' bare allegations that they were "licensed, approved, and controlled by DHS as foster parents," and that "DHS placed [the foster child] in their home." *Id.* ¶ 27. Importantly, the foster parents did not allege the manner in which DHS controlled, or had the right to control, their service as foster parents. Without this crucial information, we ruled that "it is not possible to distinguish as a matter of law whether the [foster parents] are [E]mployees, who are entitled to immunity." *Id.*

¶31 The facts of this case are readily distinguishable. In *Four Corners*, the extent to which DHS actually controlled or had the right to control the foster parents was impossible to discern because there was no evidence in this regard beyond the foster parents' mere allegation of general control. In this case, however, the evidence supporting Provo City's right to control is established by more than

bare assertions made by the BYU Defendants. The Provo City Code controls whom BYU may employ to direct traffic, when BYU may direct traffic, and mandates that BYU traffic cadets be supervised by a peace officer who is also an employee of BYU. PROVO, UTAH, CODE § 9.10.060(2). Additionally, other ordinances support the right of Provo City to remove or control any nonofficer who is directing traffic within the Provo City limits. *See id.* § 9.01.050(1). From this evidence, as detailed above, we are able to conclude that Provo City not only had the right to control, but also exercised some degree of actual control over the manner, place, and time in which BYU Defendants directed traffic. Therefore, the BYU Defendants qualify as servants of Provo City and thus as Employees under the Act.

## CONCLUSION

¶32    We hold that the court of appeals' construction of the Act's statutory definition of Employee was in error. Additionally, we hold that the BYU Defendants were servants of Provo City and therefore statutory Employees under the Act. Consequently, Mr. Mallory's failure to file a timely notice of claim divested the district court of subject matter jurisdiction over his lawsuit. We therefore reverse the court of appeals' decision vacating the trial court's order of dismissal.

———————

JUDGE STONE, dissenting:

¶33    I respectfully dissent. Drawing all reasonable inferences from the factual record in favor of Mr. Mallory, as is required under a rule 12(b)(1) analysis, the facts in this case are not sufficient to conclude that the BYU defendants qualify as "employees" under the Utah's Governmental Immunity Act (Act).[1] To the contrary, the evidence developed below supports an inference that BYU's relationship with Provo City was one of independent contractor, thus excluding BYU from the statutory definition of employee.

———————————

[1] As a procedural matter, a motion to dismiss brought under rule 12(b)(1) of the Utah Rules of Civil Procedure is governed by the same standard of review as a rule 12(b)(6) motion. Specifically, factual allegations are accepted as true and all reasonable inferences to be drawn from those facts are considered in a light most favorable to the plaintiff. *See Gregory v. Shurtleff*, 2013 UT 18, ¶ 8, 299 P.3d 1098; *Peterson v. Delta Air Lines, Inc.*, 2002 UT App 56, ¶ 2, 42 P.3d 1253.

**ANALYSIS**

I. THE PROPER ANALYSIS BEGINS WITH THE ACT'S
EXCLUSION OF INDEPENDENT CONTRACTORS
FROM THE DEFINITION OF "EMPLOYEE"

¶34    First, I agree with Part I of the Court's opinion that the Utah Court of Appeals erred in interpreting the Act. The issue is simply whether the BYU defendants were servants or independent contractors. Independent contractors are expressly excluded from the definition of "employee" under the Act; "servants" are included. Therefore, in examining whether the court of appeals erred in reversing the trial court's granting of the BYU defendants' motion to dismiss, the proper inquiry should be whether the BYU defendants qualify as independent contractors.

¶35    The factors relevant to an assessment of independent contractor status and the right-to-control concept have been applied "most frequently when deciding whether a worker was an employee or an independent contractor for the purpose of determining whether the Workers' Compensation Act controlled the remedies available to an injured party." *Dyson ex rel. Glover v. Boy Scouts of Am.*, 923 P.2d 1383, 1385 (Utah 1996). However, the common law right-to-control standard is derived from agency law, "the purpose of which is to define the limits of a master's vicarious liability for a servant's tortious conduct." *Id.* (citing *Bennett v. Indus. Comm'n*, 726 P.2d 427, 430 n.2 (Utah 1986); RESTATEMENT (SECOND) OF AGENCY § 220 (1958) (outlining elements of right-to-control test)).

¶36    This court has identified several main facts which are helpful in determining whether an employer had the right to control an alleged employee. *Averett v. Grange*, 909 P.2d 246, 249 (Utah 1995). These factors include (i) "whatever covenants or agreements exist concerning the right of direction and control over the employee"; (ii) "the right to hire and fire"; (iii) "the method of payment" (i.e., wages versus payment for a completed job or project); and (iv) "the furnishing of equipment." *Id.* (internal quotation marks omitted).

¶37    Importantly, it is the right to control the physical manner in which the work is performed that is determinative. In *Dowsett v. Dowsett*, this Court emphasized that

> "[a]n agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency is in a similar relation to the principal as to such

conduct as one who agrees only to accomplish mere physical results. For the purpose of determining liability, they are both 'independent contractors' and do not cause the person for whom the enterprise is undertaken to be responsible . . . ."

207 P.2d 809, 811 (Utah 1949) (emphasis omitted) (quoting RESTATEMENT (FIRST) OF AGENCY § 220 cmt. c (1933)). This is the key distinction between the agent who is a servant and the agent who is an independent contractor. As the Restatement indicates:

(1) A master is a principal who employs an agent to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.

(2) A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.

(3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent.

RESTATEMENT (SECOND) OF AGENCY § 2 (1958).

¶38    Not surprisingly, in the context of respondeat superior liability, this court has applied a similar right- to-control test. *See Foster v. Steed*, 432 P.2d 60, 63 (Utah 1967). The *Foster* case dealt with the relationship between a franchisor oil company, Texaco, and its franchisee, an operator of a service station. The court held that "[n]one of the evidence cited by plaintiff indicates that Texaco retained control of the [franchisee's] day-to-day operation but, rather, merely influenced the result to be achieved, revealing an independent contractor status." *Id.*

## II. AFTER APPLYING THE RIGHT-TO-CONTROL TEST TO THE PROFERRED EVIDENCE, THERE IS A REASONABLE INFERENCE THAT BYU IS AN INDEPENDENT CONTRACTOR

### A. BYU's Relationship with Provo City Is not Clearly Defined in the Record, but Stems from a Nonbinding Ordinance

¶39    "'[A]n agency is created and authority is actually conferred very much as a contract is made': a meeting of the minds must exist between the parties." *Wardley Corp. v. Welsh*, 962 P.2d 86, 89 (Utah Ct. App. 1998) (quoting 3 AM. JUR. 2D *Agency* § 17 (1986)). Therefore, the first inquiry is into the fundamental nature of the relationship between BYU and Provo City.

¶40    In undertaking a similar analysis, the majority suggests that the relationship between Provo City and the BYU defendants stems from the Provo City ordinance, which provides that "a person who is employed by a college or university and is not a peace officer may direct traffic on public streets while under the supervision of a peace officer employed by the same college or university." PROVO, UTAH, CITY CODE § 9.10.060(2). As the majority observes, this ordinance is limited to circumstances of "public emergency or to aid in the orderly movement of traffic related to public gatherings in excess of 5,000 people." *Id.* § 9.10.060(3).

¶41    The majority errs when it concludes, based on this ordinance, that "[t]he relationship between Provo City and the BYU Defendants, acting pursuant to the Provo City ordinance, exhibits the hallmarks of a master-servant relationship." *Supra* ¶ 24. The Provo City ordinance is permissive and does not bind anyone to act; it has no effect unless BYU agrees to provide traffic control, hire cadets, and supervise them. While the Provo City ordinance would have facilitated this agreement, there is nothing in the record regarding the operative terms of this agreement or even whether it was oral or written. Thus, there exists a gap in the evidence regarding the pivotal issues of the creation and existence of BYU's relationship with Provo City vis-à-vis the provision of traffic control. The majority does not address this gap in evidence, but instead too narrowly focuses on the ordinance alone as defining these parties' relationship when it is merely one aspect of the relationship. As a corollary, Ms. Robinson's actions as traffic cadet stem from and are influenced by the relationship between BYU and Provo City, but her actual authority is derived from her employment by BYU, the terms of which are not in the record. Because the ordinance expressly requires that she be an employee of BYU, she cannot have greater status, vis-à-vis Provo, than BYU. *Cf. Luker Sand & Gravel Co. v.*

*Indus. Comm'n*, 23 P.2d 225, 227 (Utah 1933) ("In no event could Osment's relationship to the Sand & Gravel Company be more intimate than that of Hobbs himself.").

¶42    The majority posits that "most importantly . . . because the BYU Defendants derive their authority to direct traffic *exclusively* from the Provo City ordinance, Provo's city council could, at any time, rescind the ordinance or amend it to provide for additional control and direction over BYU and its agents." *Supra* ¶ 27 (emphasis added). Respectfully, this observation is based on the flawed premises that the ordinance, rather than an actual agreement, is the exclusive source of authority and, secondarily, that a governmental entity retains the right to control simply through the power to legislate. An agent of the government is always subject to a potential right to control by future legislation. The fact that Provo City could rescind or amend the ordinance in the future to create a level of control that did not previously exist cannot provide the foundation for finding a master-servant relationship. Such an approach would render the Act's clear exception of independent contractors from the term "employee" meaningless.

¶43    The government's potential power to regulate is really no different in this regard than the retained authority of a private person using an independent contractor. A homeowner might require a plumber to perform "in a workmanlike manner" but that is hardly the retention of a right to control. *See Dowsett v. Dowsett*, 207 P.2d 809, 811 (Utah 1949) (recognizing that a nonservant may operate under an agreement "to use care and skill in accomplishing results"). A homeowner might go further and specify a particular faucet to be installed by a plumber, but that would not amount to sufficient control to vitiate the independent nature of the plumber. The homeowner could, hypothetically, by virtue of his right to control who may enter his or her home, insist on supervising every aspect of the plumbing job, down to work hours, uniforms, the snugness of the joints and the sealant used. This might transform the contract between the homeowner and the plumber into an employer-employee relationship. But the fact that a homeowner has the legal ability to structure the relationship in that manner does not mean that all homeowners who hire plumbers are employers. A party's mere legal ability to insist on a different agency, whether it derives from legislative power or otherwise, does not constitute a right to physically control the agency that actually existed.

¶44    All agents are subject to control. It is control over the physical manner of carrying out the work that determines servant or

independent contractor status. Here, the record supports only a general restriction on BYU's ability to direct traffic on city streets at its large events: *if* BYU chooses to use cadets, they must be BYU employees and they must be supervised by POST-certified BYU police. That is hardly control by Provo over the physical conduct of the BYU police or its cadets.[2]

¶45   A city might contract with an independent contractor to paint a courthouse, build a jail, or repair a highway. The fact that such contracts might have limitations specifying what the job is—which courthouse and which color, detailed architectural plans for the jail, or traffic safety requirements for the highway repair—does not imply a retained right to control that transforms the relationship from an independent contract. Similarly, if a city were to contract with a private firm to provide snow plowing, but only when it snows, the fact that snowstorms might occur intermittently does not equate to a "right to control" when the plowing occurs. Here, absent more evidence, it can be inferred that Provo has simply determined to allow BYU or its private police force the authority to control traffic at large university events.

¶46   Finally, even if we were to consider only the ordinance itself, its terms do not support a conclusion that Provo City had the right to control the physical conduct of the traffic cadet's duties. Instead, the ordinance at issue is an express delegation to BYU and its private police force of the rights to hire and supervise cadets. This is the opposite of Provo reserving the right to control: instead of supervising the physical conduct of the traffic cadet's duties, Provo allowed a private party to do so. This loose, standardless delegation would not be enough to render Provo City liable based on BYU's performance of the task, and therefore should not be enough to result in immunity.

¶47   The court should have examined the actual agency relationship as it existed at the time of the accident for purposes of liability and immunity. The question here is, having authorized

---

[2]   State statute places fairly extensive restrictions on private security guards, considerably more than the restrictions placed on BYU in using traffic cadets. *See* UTAH CODE §§ 58-63-101 to -503. Under the court's reasoning, should a private guard end up performing a governmental function such as directing traffic at a private event, they are immune. Likewise, are private highway contractors' flagpersons, who presumably also operate under at least some state regulation or safety laws, similarly immune from civil action?

agent (BYU and its cadets) to perform a task, what control did Provo actually reserve? What was the actual arrangement that existed at the time of the accident? Applying the established test for finding an independent contractor, and at this stage indulging all inferences in favor of the nonmoving party, the court should ask: (1) what covenants, express or implied, exist concerning the right to control the physical manner in which the work is carried out? (2) which party had the right to hire and fire? (3) what was the method of payment? and, (4) who supplied tools and equipment? *Harry L. Young & Sons, Inc. v. Ashton*, 538 P.2d 316, 318 (Utah 1975).

### B. The Facts Support an Inference that the BYU Defendants Were Independent Contractors

¶48    As to the first question, the parties agreed that, if cadets were used, they would be employed by BYU and supervised by BYU police.[3] It does not matter that cadets perform a governmental function; the Act assumes that there will be governmental functions delegated[4] to independent contractors, and does not extend immunity to them.

¶49    The ordinance limits traffic cadets' authority to direct traffic to certain defined circumstances and conditions. That is consistent with an independent contractor relationship, which is typically limited to a "particular project or piece of work." *Young & Sons,* 538 P.2d at 318.

¶50    The record indicates that Provo City had no involvement in Ms. Robinson's supervision. Ms. Robinson was on the radio with her supervising BYU police officer and not a Provo City police officer. Provo City did not dictate how many hours cadets worked or determine where they would be stationed. Indeed, the Provo City police chief's affidavit merely states that he had "witnessed" cadets

---

[3]  The Court's opinion necessarily implies that the BYU police, when supervising cadets, are also Provo employees. They are, after all, acting for Provo and subject to the same "control" as the cadets. Is Provo liable for workers compensation claims for these officers? Tax withholding? Overtime violations? Why would the tests be any different?

[4]  While Provo may have a nondelegable duty here to maintain safe streets, that is irrelevant for purposes of analyzing who is an "employee" under the act. The Act makes no distinction between delegable and nondelegable functions. Plainly, state actors engage independent contractors to perform nondelegable duties all the time. Every state highway project potentially involves such contracts.

in action and was "satisfied" with their "professional manner." There is nothing in the affidavit to suggest that the chief or other Provo City police officers, acting in their official capacities, reviewed the cadets' performance or provided input regarding the manner or method in which they performed their duties. The same can be said with respect to the training provided to cadets. As acknowledged at oral argument and as confirmed by the chief's affidavit, the chief simply "reviewed" the training carried out by BYU and was "satisfied" with that training.

¶51    Next, Provo City did not participate in BYU's hiring or firing decisions regarding cadets. The Provo City ordinance in this case contemplates that the individuals directing traffic, under the circumstances discussed above, would be employed by "a college or university," thus implying that BYU and not Provo City would retain the right to hire and fire these individuals.  In fact, the record implies that BYU was solely responsible for reviewing the cadets' skills and qualifications as part of the selection process, engaging the cadets, and compensating the cadets.

¶52    Notably, the majority concludes that Provo City "retained the right to discharge the BYU Defendants . . . at any time" and cites Provo City Code section 9.01.050(1) as support for this proposition. *Supra* ¶ 26. However, the cited ordinance grants the Provo chief of police power to suspend only with respect to officers and agents "in the Police Department" and does not extend to the BYU police or its cadets.[5] The police chief's affidavit conveys that the two police departments, Provo City and BYU, coordinate on a regular basis and that he considers the BYU police officers to be "colleagues" rather than subordinates. The fact that BYU had the sole right to hire and fire, as well as to direct and supervise the cadets, favors a finding that the cadets were employed by BYU in carrying out independent

---

[5] The Provo Code establishes a Provo Police Department, PROVO, UTAH, CODE § 9.01.010, and the provisions giving the Provo chief control do not even permit him to fire subordinate officers—only suspend them for up to fifteen days. *Id.* § 9.01.050(1). By its terms, this does not apply to BYU police or BYU cadets. Importantly, the Provo chief also has the ability to appoint special patrolmen to serve without pay and expressly requires the Chief to supervise such patrolmen. *Id.* § 9.01.070. It is revealing that Provo evidently had the ability to appoint its own volunteer patrolmen, and retain supervision of them, but did not do so with respect to traffic control at BYU events. Instead, it authorized BYU to employ cadets, and required that BYU supervise them.

contractor duties. *See Ludlow v. Indus. Comm'n*, 235 P. 884, 888 (Utah 1925) ("[A]n independent contractor can employ others to do the work and accomplish the contemplated result without the consent of the contractee, while an employé cannot substitute another in his place without the consent of his employer.").

¶53    In addition to the lack of supervision and hiring/firing authority, Provo City also had nothing to do with the compensation provided to either the cadets or the BYU police. The payment of compensation is a key factor commonly used to distinguish between independent contractor and employees in a variety of contexts. *See Young & Sons*, 583 P.2d at 318 (listing as a factor to consider "the method of payment, i.e., whether in wages or fees, as compared to payment for a complete job or project").

¶54    Specifically, BYU receives no compensation from Provo for traffic direction. By using its own employees and cadets, BYU assumes the risks and reaps the benefits of having control over staffing those positions. That is a hallmark of an independent contractor rather than an employee. Likewise, the basic indicia of an employment relationship between Provo City and the cadets are missing. Provo City did not provide Ms. Robinson any wages, benefits, or insurance or withhold any taxes from her compensation. While not dispositive, the manner in which the parties structured their relationship is at least probative of Ms. Robinson's status as a servant or independent contractor.

¶55    The final factor weighing in favor of an inference that the BYU defendants were independent contractors is that Provo City did not provide any equipment necessary for the cadets or the BYU police to perform its traffic control activities. Consistent with the other factors, all favoring an independent contractor status, the record reveals that BYU retained the right to determine appropriate equipment.

¶56    To conclude, Provo City passed an ordinance that authorizes university cadets, employed by a university and supervised by university police, to direct traffic in certain specified situations. Based upon the record below, there is nothing to indicate that Provo City reserved any authority over those cadets, either in terms of supervision, hiring, firing training, disciplining, dispatching, or assisting. BYU, pursuant to the Provo City ordinance, employed Ms. Robinson, among others, as student cadets to assist BYU's own police force in traffic control and direction activities on Provo City streets. On this record, we must infer that

BYU selected Ms. Robinson, directed her in the timing and placement of her traffic direction, provided her with any necessary traffic control equipment, and otherwise supervised every aspect of her duties. Nothing in the record suggests that Provo had any say in how many cadets (if any) were assigned to work that day, where they were stationed, how many were supervised by how many university police officers, how long before the game they appeared, how long after they stayed, how they dressed, or whether they were equipped with flags, flares, whistles, vests, or signs. Under these circumstances, there is at least an inference that the BYU defendants were acting as independent contractors without active participation by Provo City. Based on that inference, the motion to dismiss should have been denied. I would affirm the Utah Court of Appeals.

———————